Mary GLOVER et al., Plaintiffs,

v.

Perry JOHNSON, Director, Michigan
Department of Corrections, et al.,
Defendants.

Civ. A. No. 77–1229.

United States District Court,
E. D. Michigan, S. D.

Oct. 17, 1979.

Order Oct. 25, 1979.

Judith Magid, Center for Urban Law, Charlene Snow, Michigan Legal Services, Detroit, Mich., for plaintiffs.

William Molner, Asst. Atty. Gen., Crim. Div., Duane T. Triemstra, Kalamazoo, Mich., for defendants.

## OPINION

FEIKENS, Chief Judge.

On May 19, 1977, a civil rights suit was filed on behalf of present and future females incarcerated by the State of Michigan against the Director and other officials of the Michigan Department of Corrections, the Corrections Commission, and various administrators of the Detroit House of Correction (then being used as the principal place of incarceration of female prisoners). Plaintiffs sought a declaration by this Court that the State, through its Department of Corrections, had violated their rights under the Constitution. Plaintiffs also asked for injunctive relief to secure these rights. The original complaint focused on alleged inequalities apparent in the treatment and rehabilitation programs available to Plaintiffs at the Detroit House of Correction when compared to those programs available to male offenders in various prison facilities throughout the State.

Plaintiffs were subsequently permitted to amend their Complaint in order to take into account the opening of the Huron Valley Women's Facility [Huron Valley] and the transfer of the State female prisoners from the Detroit House of Correction to the new facility. Moreover, soon after Huron Valley's opening, Defendants began sending selected women prisoners to the Kalamazoo County Jail [Jail] in order to relieve overcrowding at Huron Valley. Consequently, Plaintiffs also addressed this action in their

Amended Complaint and added the Sheriff of Kalamazoo County as a party Defendant.[1]

In an opinion filed December 23, 1977, I granted Plaintiffs' motion for certification of a class composed of all females who are presently, or may be in the future, incarcerated by the State at Huron Valley or the Kalamazoo County Jail. A subclass consisting solely of the women incarcerated at the Jail was also certified at that time. The formal structure of the case was finally set on March 17, 1978 when *Charmaine Cornish, et. al. v. Perry Johnson, et. al.,* Civil Action No. 77–72557, was consolidated with this suit on grounds that the chief issue in *Cornish*—the adequacy of the law library furnished to women at the Detroit House of Correction and at Huron Valley—had also been raised in *Glover,* and that the interests of justice would best be served by their consolidation. Subsequently, Plaintiffs in both cases agreed that Plaintiffs in *Cornish* would be responsible for presenting this issue at trial.

Following a considerable amount of pretrial discovery and negotiation between the parties, a total of ten days of trial testimony was heard. Plaintiffs presented the testimony of the named class representatives, other women prisoners from both Huron Valley and Kalamazoo, male prisoners from other State institutions, and representatives from the Federal Bureau of Apprenticeship and Training, the Michigan Employment Security Commission, and the Michigan Department of Corrections, among others. Expert testimony was given by Dr. Otto Feinstein, Professor and Associate to the Vice-President for Urban Affairs at Wayne State University; Dr. David Fogel, Professor and Director of Graduate Studies in Criminal Justice at the University of Illinois, Executive Director of the Law Enforcement Commission, and former director of the Minnesota Department of Corrections; Elsie Dennison, labor economist and specialist on women offenders with the

---

1. Throughout this opinion, the State-affiliated Defendants will be referred to as the "State" or simply "Defendants." In those instances where the Kalamazoo Defendant is addressed, he will be specifically designated as such.

Women's Bureau of the United States Department of Labor; and Jane Chapman, co-director of the Center for Women Policy Studies and director of a project devoted to the problems of the economic rehabilitation of female offenders.

Defendants' witnesses included representatives from the administration of Huron Valley, Kalamazoo County Jail, and the State Prison of Southern Michigan, as well as several officials from the Department of Corrections: Perry Johnson, Director of the Department; Wilbert Laubach, Director of Education; and Rudolph Stahlberg, a Regional Administrator for the Department.

In their original complaint, Plaintiffs asserted jurisdiction in this Court based on 42 U.S.C. § 1983 as a result of the alleged denial of their right to equal protection and due process under the Fourteenth Amendment, and because of an alleged violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. Plaintiffs claimed that the State had violated their constitutional rights by offering educational and vocational rehabilitation opportunities substantially inferior to those offered male prisoners. Plaintiffs contrasted the comprehensive vocational and work programs created for male prisoners with the minimal offering of vocational programs available at the Detroit House of Correction. Similarly, they asserted that college-level courses leading to a degree were available to male prisoners though not to females. To the extent that the State receives federal aid for its educational programming, Plaintiffs alleged that this discrimination constitutes a violation of Title IX. After the complaint was amended to include references to Huron Valley and Kalamazoo County Jail, new issues were raised concerning the alleged infringement of Plaintiffs' rights to free expression and religious practice under the First Amendment and a claimed violation of the Eighth Amendment's ban on cruel and unusual punishment.

In its final form, the complaint challenges the entire range of treatment programs for female prisoners including educational opportunities, vocational and apprenticeship training, prison industry and work pass programs, wage rates, and library facilities as compared to those offered to male prisoners. The complaint against Kalamazoo focuses on the lack of programming, inadequate jail facilities, and the actual conditions of confinement at the jail.

Defendants deny that any of its policies violate the constitutional rights of its prisoners, explaining such differences as might exist on the basis of economic efficiency—i. e., that the smaller number of women make the extension of identical programs to Huron Valley impractical and excessively costly. Further, Defendants state affirmatively that Huron Valley as an institution fares as well as, or better than, any similarly-sized male institution in the State correctional system.

As a result of Plaintiffs' decision not to pursue the Title IX claim, the only grounds on which the case remains to be decided are constitutional—specifically, the Due Process and Equal Protection Clauses of the Fourteenth Amendment and those aspects of the First and Eighth Amendments made applicable to the State through the Fourteenth Amendment.

In this opinion, I discuss the appropriate standard by which to review Plaintiffs' constitutional claims, and then apply that standard to each of the major areas they have challenged: educational and vocational programming, adequacy of the institutional facilities, prison industry and wage rates, and work pass programs. I treat separately the claims concerning the law library first raised in *Cornish v. Johnson*. Finally, the opinion addresses the issues raised by Defendants' use of the Kalamazoo County Jail.

I

A

Before analyzing this situation in equal protection terms, it is necessary to select a standard by which the practices of the State can be measured against its goals for the corrections system generally. The critical factor in this analysis is gender. It is clear that the State has provided for the

separate incarceration of male and female prisoners, and that Huron Valley is the principal facility devoted to the custody of female prisoners. Thus, a female felon in the State of Michigan will be sent to Huron Valley by reason of her gender alone, and will necessarily have access only to these programs currently available at that location. A male prisoner, on the other hand, can be classified or later transferred to a wide variety of prison facilities in the State and generally will have access to more program opportunities than his female counterpart. I conclude, therefore, that because of these limitations women as a group are treated differently than men as a group, and that these differences in treatment are directly related to gender.

The State argues, however, that any differences in treatment are the result of the limitations placed on them by the size of the institution and not the sex of the inmates housed there. There is, of course, no fixed relationship between size *per se* and the kinds of programs offered in any given institution. There is, however, an economic relationship which, if not fixed, is at least of great practical significance in determining the range and quality of programs offered. While recognizing that reality, these considerations alone cannot justify official inaction or legislative unwillingness to operate a prison system in a constitutional manner. *Gates v. Collier,* 501 F.2d 1291, 1319–20 (5th Cir. 1974); *Pugh v. Locke,* 406 F.Supp. 318, 330 (M.D.Ala.1976), *aff'd and remanded,* 559 F.2d 283 (5th Cir. 1977); *Holt v. Sarver,* 309 F.Supp. 362, 385 (E.D. Ark.1970).

In arguing that Huron Valley offers programming of comparable and sometimes better quality than that available in similarly-sized male institutions, the State avoids the fact that *all* State female felons are sent to Huron Valley while *all* male felons are *not* confined in a facility of comparable limitations. In this context, "institutional

size" is, frankly, not a justification but an excuse for the kind of treatment afforded women prisoners.[2]

### B

Despite persuasive arguments that the strictest form of judicial scrutiny should be employed here, I believe that Defendants are correct in asserting that a less rigorous standard of review is applicable. Beginning with *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), the Supreme Court has dealt with the problem on several occasions. While the plurality opinion in *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), supports Plaintiffs in this regard, I believe the appropriate standard has been expressed in *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976):

> To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.

*See also Davis v. Passman,* —— U.S. ——, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Massachusetts v. Feeney,* —— U.S. ——, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977); *Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977).

The question remains, however, whether the usual remedy in cases dealing with discriminatory classifications—i. e., the extension of benefits to the class previously excluded by the classification—is appropriate in this context. That problem was faced by the District Court of New Mexico in *Barefield v. Leach,* Civ.Act. No. 10282 (D.N.M. 1974), a case remarkably similar to this.

In *Barefield,* two of the thirty-six women inmates of the Penitentiary of New Mexico

---

**2.** The point is seen more clearly perhaps if black prisoners are substituted for females in this discussion. Surely the State could not believably maintain that this arrangement would also be constitutionally innocuous. In addition, the illustration emphasizes the fact that the State has constitutional obligations to its individual prisoners which override other, economic considerations.

filed a wide-ranging lawsuit alleging constitutional violations in the operation of educational and vocational programming for women, the physical conditions of their confinement at the institution, and the administration and enforcement of prison regulations. After surveying the relevant decisions of the United States Supreme Court, the court concluded:

> In light of the cases discussed above, it is apparent that a majority of the Court has not ruled that all classifications based on sex are inherently suspect, thus requiring close judicial scrutiny and placing the burden on the state to come forth with a compelling state interest to justify their actions. However, it is equally apparent that the subject of the present suit entails matters which reach . . . deeply into the personal day to day well-being of the two plaintiffs . . . . In this area of constitutional law, each suit must be approached with caution and disposed of on a case by case basis. In the final analysis, it is the facts as opposed to legal "tests" that control the court's decision. *A synthesis of these cases leads to the conclusion that what the Equal Protection Clause requires in a prison setting is parity of treatment, as contrasted with identity of treatment, between male and female inmates with respect to the conditions of their confinement and access to rehabilitation opportunities.* The state can justify a lack of parity in treatment or opportunities when its actions have a fair and substantial relationship to the purpose of the inmate's incarceration.

*Id.,* slip op. at 37–38 (emphasis added).

The court then found that the state had failed to provide parity in several areas, among them vocational programming, assignment to wage-paying work within the institution, and provisions of adequate facilities for avocational projects. *Id.,* at 39–40.

The court's reasoning is sound and fully consistent with *Craig v. Boren* which followed two years later. The term "parity of treatment" describes concisely the standard to which, I believe, the State ought to be held in its treatment of female prisoners.

In other words, Defendants here are bound to provide women inmates with treatment and facilities that are substantially equivalent to those provided the men—i. e., equivalent in substance if not in form—unless their actions, though failing to do so, nonetheless bear a fair and substantial relationship to achievement of the State's correctional objectives.

The possibility of judicial intervention in matters of State concern must be approached cautiously. Given the typical complexity of the problems in operating a prison system, a policy of deference to the decisions of responsible State officials is required. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

> It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons. . . . Since these internal problems of state prisons involve issues so peculiarly within state authority and expertise, the States have an important interest in not being bypassed in the correction of those problems.

*Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973).

Nonetheless, "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims" presented by state prisoners to federal courts. *Procunier v. Martinez, supra,* 416 U.S. at 405, 94 S.Ct. at 1807. This court, therefore, must discharge its duty to protect the constitutional rights of the prisoners now before it.

### C

As the statements from *Craig* and *Barefield* indicate, equal protection analysis focuses on the relationship between the legislative classification and the ends to which the legislation is directed. The legislation here in question generally concerns the operation of the State Department of Correc-

tions, M.C.L.A. §§ 791.201–791.265a, the operation of the state prisons, M.C.L.A. § 800.-33 et seq., and the authorization for the separate housing of female prisoners, M.C.L.A. § 802.11 and § 802.51. The administrative regulations which specifically govern the operations of the correctional system are also pertinent. *See* 1954 Mich.Admin. Code, R 791.1101–791.4001 (Supp.1978) [hereinafter 1954 MAC, R 791.1101 *et seq.*].

Plaintiffs assert that the scheme by which women prisoners are sent to Huron Valley and male prisoners to a variety of other institutions is a classification by gender that results in the less favorable treatment of female felons. The fact that the State does classify male and female prisoners to different institutions is not controverted.

The practice of confining men and women separately has been authorized by statute for many years, beginning with the State's use of the Detroit House of Correction to house its female prisoners. *See* M.C.L.A. § 802.51. That practice continued when the State itself assumed control of the operation of that facility, and has been maintained following the opening of Huron Valley.

The classification in question is not on its face a legislative determination that female prisoners shall receive less extensive program choices than males. *Cf., e. g., Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). Rather, the classification merely assigns women prisoners to Huron Valley and male prisoners to other facilities. But, given the existing schedule of educational and vocational programming at Huron Valley and the condition of the facilities and equipment located there, the alleged practical effect of the otherwise justifiable legislative decision to house the sexes separately is to deny the women access to programs of a range and quality comparable to those offered the men. Where the actual consequence of a seemingly harmless classification reveals such disparate treatment, there is ample justification to treat the classification and its consequence together in order to determine the "fit" be-

tween this end result and the legislative purpose. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Williams v. Illinois,* 399 U.S. 235, 242, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970). Thus, in this case, I must determine, first, whether the practices at Huron Valley achieve in any way the goals and purposes of the corrections system; and, second, whether the relationship between the practice and the legislative purpose is sufficiently substantial to justify the dissimilar treatment of the State's female prisoners.

The relevant provisions are those which govern the selection and implementation of programming in state institutions. In this case, however, the statutory language merely authorizes the Director of the Department of Corrections to promulgate rules concerning "the management and control of state penal institutions," and for the "management and control of prison labor and industry." M.C.L.A. § 791.206(d), (e). Although educational and vocational programs, for example, clearly fall within the scope of these provisions, the statutes are largely silent as to the purposes of such programs or the manner of their implementation.

Legislative silence is broken, however, in the Correctional Industries Act, M.C.L.A. §§ 800.321–800.335. In a section entitled "Purpose and intent of act," M.C.L.A. § 800.331, the legislature states its goals in authorizing the establishment of manufacturing and production facilities at state institutions. Although the provisions refer mainly to the economic relations between prison industries and other state and private entities, according to subsection (a) the legislature intends "to provide adequate, regular, diversified and suitable employment for inmates of the state consistent with proper penal purposes."

The "proper penal purposes" are described more specifically in § 800.327 which sets the priorities intended to govern the types of employment selected for the prison industry at a given site.

The corrections commission shall provide as fully as practicable for the employ-

ment of inmates in tasks consistent with the *penal and rehabilitative purposes of their imprisonment* and with the public economy. (Emphasis supplied.)

The order of priority created calls first for providing the "Routine, maintenance and constructive activities contributing to the conduct of the several institutions in a manner most favorable to their correctional and rehabilitative purposes and to the minimum costs to the state." The next highest priority in selecting the appropriate industry follows: *"Education and rehabilitation activities,* whether formal or through productive or socialized activities, *determined on the basis of individual needs and educability."* (Emphasis supplied.) The section concludes in descending order of priority with the application of prison labor to the production of goods and services for the system itself and other units of government.

While technically limited to the matter of establishing a correctional industry program, I believe these references to education and rehabilitation are important evidence of the legislature's view of the general purpose of corrections. In this respect, the administrative regulations promulgated in accordance with corrections legislation are also helpful.

For example, 1954 MAC, R 791.4430(1) states in part:

Each institution shall provide programs for rehabilitation to provide residents the opportunity to emphasize their individual strengths and develop the ability to handle responsibility. Programs for rehabilitation shall include, but not be limited to, considerations of job readiness, educational preparedness, mental and physical health, substance abuse treatment, and socialization.

In addition, Rule 791.4435(1) requires the inclusion of a work or school assignment in each resident's program whenever possible.

In determining legislative intent in this field, I will read these rules in conjunction with Rules 791.4420 and 791.4425,[3] which establish the principles and conditions of resident release to the community prior to the expiration of his or her sentence for the purpose of obtaining employment and training outside the prison.

On the basis of these statements, I find that the overall goal of the State's treatment of its prisoners is primarily rehabilitation—that is, to provide state prisoners with treatment designed to remedy individual deficiencies in educational and vocational skills in order to enhance the likelihood of their stable, productive participation in society after release. This philosophy is tempered, however, with the growing realization that the educational, vocational, and counseling programs characteristic of the

**3.** 791.4420. Community status; work or study release; conditions.

Rule 420. (1) When all the criteria and procedures of rule 410 are met, a resident may be classified to community status to work at paid employment or to participate in a program of training or study.

(2) Each institution shall designate personnel responsible for screening, selection, and processing of work and study release applications.

(3) Work release employment shall not result in the displacement of employed persons. The pay scale shall meet minimum wage requirements for similar work in the community. The place of employment shall provide proof of workmen's compensation coverage and shall meet prevailing safety standards. The department shall maintain liaison with the employer and the appropriate Michigan employment security commission office.

791.4425. Community status; residence; expenses; conditions; violation.

Rule 425. (1) A resident classified to community status may reside at any designated department facility. A resident classified to community status who meets the requirements of rule 415 may be furloughed from any designated department facility.

(2) Each resident classified to community status shall pay expenses as specified by the director. Appropriated funds in a specified amount may be used to pay for room and board, transportation, and necessary incidental expenses for a cumulative period established by the director through an authorized representative.

(3) Each resident classified to community status shall be subject to general and special conditions established by an authorized representative of the director. When a violation of a condition is alleged, which constitutes major or minor misconduct, the charged resident is entitled to an administrative hearing as provided for in rules 310 and 315.

rehabilitative model may not sufficiently prepare the prisoner for his or her re-entry into the free world after an extended period of incarceration, nor provide an education in the rudimentary mechanics of participating daily in working society. The creation of halfway houses, community treatment centers, and work release and work pass programs, like those referred to in Rules 791.4420 and 791.4425, are some examples of methods adopted to deal with the problem of reintegrating the prisoner approaching release into open society.

The evidence at trial generally supports this conclusion, and, in particular, I refer to the testimony of Rudolph Stahlberg, regional administrator for the Michigan Department of Corrections, whose area of responsibility includes Huron Valley.[4] Stahlberg testified that the Department had been operating the corrections system on the basis of the rehabilitative model, but was now in the process of implementing programs consistent with the goals of prisoner reintegration. The two models can co-exist indefinitely, although Stahlberg's reference to the continuing emphasis on community residential facilities may indicate the department's greater commitment to the goal of reintegration.

Regardless of the departmental policy selected, I read M.C.L.A. § 791.202 as evidence of the legislative intent to implement the chosen policy on a system-wide, uniform basis. The overall programming goals at

Huron Valley, therefore, should be the same as those at male institutions, taking into account those differences in programs which are designed to meet the special needs of a particular population group. Indeed, I find no evidence on this record that the Department views its *general purpose* in administering the vocational and educational programs differently at Huron Valley than at male institutions.[5]

In addition to these correctional goals, certain specific principles were developed at trial and accepted as desirable in the creation of vocational and educational programming. First, the marketability of skills is an important consideration in the selection of specific vocational and related educational units. The testimony of Plaintiffs' experts, David Fogel and Jane Chapman, and that of Perry Johnson, Director of the Michigan Department of Corrections, established the utility of teaching the women a range of employment skills within the period of time they normally serve at Huron Valley. These skills should be transferable on release to jobs of more than menial status that will be available on the outside.

Second, an equally vital concern is the level of prisoner interest in various occupations or skill areas. While evidence from both sides generally supports this principle, Plaintiffs' experts insisted that the prisoner population is not likely to display an informed or sophisticated awareness of occu-

4. In addition to Stahlberg's testimony, the 1976 report of the Michigan Department of Corrections entitled "Dimensions," Plaintiffs' Exhibit 10, expresses a similar position, *id.,* at 21–25. "Rehabilitation is viewed by the department as a process of internalizing values, social attitudes and the skills necessary for social integration. . . ." The report goes on to describe at greater length the variety of treatment programs available within the system.

5. In so concluding, I reject the contention that the State's treatment of its female inmates, even if unequal to its treatment of males, is nonetheless justified because of its substantial relation to a set of governmental objectives unique to women prisoners. The chief difficulty with this position is that the objectives apparently served by present programming at Huron Valley may be viewed as characteristic of role and gender stereotypes rather than the

product of an examination of the actual needs and interests of the women—in the words of Justice Stevens, "[i]t is fair to infer that habit, rather than analysis or actual reflection" produced these results. *Califano v. Goldfarb,* 431 U.S. 199, 222, 97 S.Ct. 1021, 1035, 51 L.Ed.2d 270 (1977) (Stevens, J., concurring). Even if the current range of programs were not the "accidental byproduct of a traditional way of thinking about females," *id.,* at 223, 97 S.Ct. 1021, 1035 and were in fact substantially related to such objectives, I would find them vulnerable under that portion of the *Craig* standard which requires that the classification serve an "important governmental objectiv[e]." Only when analysis rather than habit results in the implementation of this or any other set of programs will the State have met this burden as well.

pational qualifications or characteristics, particularly in areas from which women have been traditionally excluded. Plaintiffs' witnesses were unanimous in coupling the desire for inmate input with the need for a course of individual employment counseling and education so that the women might have a more informed influence on the range of courses to be offered.

Third, with respect to educational programming, few generalizations are possible, although the parties appear to have assumed that the key here, too, is usefulness to the individual. William Laubach, Director of Education for the Department, listed the Department's priorities as being, first, the establishment of a minimum sixth grade reading level among the women, and, second, encouraging the attainment of a General Equivalency Diploma or its equivalent by those willing and able to do so. For his part, Dr. Fogel advised against the dilution of course or degree requirements at the post-secondary level and again urged the need for a comprehensive counseling program in this area. Defendants appeared to have effectively conceded the latter point earlier in the trial when testimony revealed that an educational counselor from Washtenaw Community College has been scheduled to appear at Huron Valley on a weekly basis.

Finally, other considerations were also mentioned—e. g., institutional needs, security requirements, and fiscal limitations—but did not receive the measure of general acceptance accorded the principles set out above.

### D

■ With the broad goals of rehabilitation and reintegration in mind, I find that, in general, the relationship between them and the actual practice at Huron Valley falls short of the requirements of equal protection under the Constitution. Significant discrimination against the female prison population occurs in several areas of programming at Huron Valley in violation of the Fourteenth Amendment and must be corrected in the manner outlined below.

### 1. Educational Programs

At the start, I find the Department's emphasis on the acquisition of sixth grade reading skills and GED equivalency laudable. Since Plaintiffs have raised no complaint regarding these programs, and it does not appear on this record that they are in any way inferior to those offered at male institutions, I do not pass on their adequacy in this case. I note only that, having undertaken to meet these basic needs of its prisoners in accordance with its general penological goals, the State has assumed an obligation to its inmates in need of such assistance which it may not abandon lightly, if at all.

Beginning with the post-secondary curriculum, however, Plaintiffs argue that because the State has chosen to emphasize educational opportunities at three male facilities to which male prisoners may be assigned or transferred, the inmates at the single female facility are disadvantaged because they lack access to institutions with a similar emphasis. Evidence was introduced to show that the community college courses made available to them at Huron Valley are less adequate than those offered to males because the course selection is narrower, and often so limited or haphazard as to make it difficult to complete successfully a course sequence leading to a major in a given field. In addition, women inmates testified that scheduling of the courses is done without regard to conflicts between equally desirable classes, and that certain course requirements described in the Washtenaw Community College (WCC) course catalog (notably laboratory and other science courses) are waived for Huron Valley inmates because they lack access to the necessary facilities, thus reducing the value and credibility of the Associate Degree (A.D.) for which they are working. Finally, they argue that the State in the past made no effort to have the women transported to WCC in order to attend classes on campus despite the fact that male inmates have this privilege and that there are a number of female inmates with a suitably low security classification.

Defendants argued thoughout that WCC exercises sole discretion with respect to the selection of available courses, that lack of inmate interest has required the cancellation of several courses in the past, and that the A.D. program offered by WCC compares favorably with those available at male institutions. Defendants specifically contested Plaintiffs' allegation that certain course requirements are regularly waived for Huron Valley inmates.[6] In addition, defense witnesses Johnson and Laubach testified that women are now being sent weekly to WCC for a single course in data processing, and that additional courses may be forthcoming.

On the basis of this record, I find that the community college courses offered at Huron Valley, in general, comport with those offered at male institutions and that overall these programs significantly further the rehabilitation of the inmates. But I stress that the State has a continuing constitutional duty to its women inmates to ensure that substantial equivalence in community college programming is maintained. Despite Defendants' claim that the college controls course offerings, I believe that the State is obligated to consult with the local college prior to each term to ensure that the level of programming does not fall and that it continues to offer a useful and challeng-

ing education to the inmates at Huron Valley. In this regard, care should be taken to design or select programs that follow a coherent educational plan over time. In Dr. Fogel's words, the "aimless" pursuit of multiple A.D.'s, particularly where the programs are incomplete or unrelated to the outside, creates an unhealthy atmosphere of futility and desperation which must be avoided if these programs are to achieve their goal in any way.

Further, I find that the State may not impede the access of women inmates to the courses they desire by abdicating its responsibilities to the college, nor by raising unnecessary barriers in the form of scheduling conflicts, inadequate facilities,[7] or restrictions on inmate movement not directly related to institutional security. While onsite classes are highly desirable because of the access to higher education that they give maximum-security inmates, I believe that, in view of the campus attendance privileges given to qualified male inmates, the State must expand this effort on behalf of its female prisoners as well. In so doing I am mindful that security risks and the number of inmates desiring a particular course are relevant considerations. They may not, however, be used wilfully to deny qualified female inmates their right to an

6. Defendants offered a letter from a WCC official in which he stated that no laboratory science classes are required for an Associate Degree in the programs offered at Huron Valley. Defendants' Exhibit 3; cf. Plaintiffs' Exhibit 16, at 20–21. In response, Plaintiffs pointed to pages 32 and 33 of the WCC 1977–78 College Bulletin [Plaintiffs' Exhibit 16] which indicates that Natural Science laboratory credits are required for the general studies program.

On closer examination it does not appear that there is any contradiction here. The general studies program to which Plaintiffs refer is a program apparently designed to permit its graduates to enter a four-year institution with full credit for the courses taken at WCC. On the other hand, there are a variety of other A.D. courses of study available at WCC which do not include any science requirements. The statement on page 20 that, in order to obtain an Associate Degree the student must complete "the specific subject course requirements in the selected program" clearly refers to the whole range of programs at WCC, at least one of

which—the college preparatory general studies program—is of particular interest to Plaintiffs.

If no laboratory work is available to Plaintiffs, then they are correct in arguing that their *general studies* program is incomplete to the extent that they could not readily gain advanced placement in a four-year program on the basis of their achievement at Huron Valley.

7. My use of the term "facilities" includes both the physical plant used for instructional purposes and any additional equipment or library materials necessary to teach the course effectively. With respect to Plaintiffs' claim that printed course materials have not always been available for research projects, I note only that this matter is easily resolved by a conference between prison and college officials in order to determine the most feasible manner of providing the necessary material to the inmates. If such material is required for the course and the women do not have access to it, then it should be provided, and the expense of doing so can be shared by the school and the Department in whatever manner they choose.

education substantially similar to that available to male inmates.

A different problem is posed by Plaintiffs' claim that the absence of a four-year degree program at Huron Valley constitutes a denial of equal protection since such programs are available to male prisoners. Testimony at trial did establish that courses leading to a Bachelor of Arts degree are offered to male prisoners at the State Prison of Southern Michigan by Wayne State University and John Wesley College, at the Michigan Training Unit by Central Michigan University, at Marquette Branch Prison by Northern Michigan University, and at the new Kinross Correctional Facility by Lake Superior State College. No such program exists at Huron Valley.

The general thrust of Defendants' evidence was aimed at demonstrating the prohibitive costs associated with providing this level of education for the relatively few numbers of qualified women at Huron Valley. Nonetheless, the State (somewhat ambivalently perhaps) also introduced the testimony of education director Laubach who related recent conversations with John Wesley College and particularly Eastern Michigan University about the feasibility of beginning a similar program at Huron Valley.

Dr. Otto Feinstein of Wayne State University testified on behalf of Plaintiffs that a four-year program could be tailored to as few as five to ten students, or even less provided that the State is willing to underwrite some portion of the expenses involved and a sound counseling program prepares the students for participation. Dr. Feinstein emphasized the desirability of beginning a program despite the small numbers discussed in view of his experience that once in place the program creates its own momentum among the prison population, thereby increasing the pool of potential students.

Nonetheless, the record does not permit me to require the State to implement a four-year program at Huron Valley. Two factors are responsible for this result: First, Director Johnson stated on the record that the current budget proposal contains a cutback in funding which will effectively eliminate educational programs above the community college level in the state prisons.[8] Second, in view of this development, I do not believe that the obligations of the State to its prisoners shaped by legislative mandate, past practices, or the requirements of the Constitution include the mandatory provision of baccalaureate programs on a system-wide basis. Thus, the State's announced decision to withdraw this element of its educational programming across the board cannot be said to prejudice unfairly any particular group or segment of the inmate population.

Needless to say, the four-year program is highly beneficial to the prisoners, and nothing in this opinion should be read to discourage attempts to locate alternate means of funding and administration wherever possible. Nor should the State consider itself disqualified from cooperating with any educational institution which seeks on its own initiative to provide a four-year program to prisoners, either by visitation, correspondence, or some other means. These efforts, of course, must be exerted fairly and for the benefit of all groups in the system, including women. But until the State adopts that course or renews its funding and direction of a four-year program, I cannot order it to perform as a duty that which it is clearly free to choose to do or not to do, so long as the choice is made fairly and without prejudice to the female inmates.

### 2. Vocational Programs

■ As with the educational programs, Plaintiffs claim generally that the vocation-

8. Laubach stated subsequently that, notwithstanding the withdrawal of state funding, the college course offered by Central Michigan University at the Michigan Training Unit will probably continue because the funding for this program is primarily federal, not state. Even so, I consider this "advantage" to the male prison population to be too slight to support an equal protection challenge by female inmates. There is no evidence, nor any allegation, that the State is attempting to circumvent its constitutional obligations in permitting this program to continue in light of its special funding structure.

al training and education offered at Huron Valley is inferior to that afforded male inmates. The State's failure to ascertain the interests and needs of its female inmates, they claim, has resulted in a set of programs which prepare the participants for low-paying menial positions in fields traditionally occupied by women. Plaintiffs request that the existing programs be expanded to match the range of programs offered males, that the program quality be upgraded correspondingly, and that an employment counseling program be started immediately to provide women with relevant information about the current job market. Plaintiffs ask also that the State be required to implement apprenticeship training and prison industry programs similar to those available to males. Finally, Plaintiffs seek alternatives to traditional incarceration comparable to those offered the men. I will address each of these concerns separately.

a.

The career development and counseling program now in place at Huron Valley is focused principally on the acquisition of job-seeking skills and the development of successful employee attitudes. The goal, as expressed by course instructor Kathy Glentz, is to place women in Community Treatment Centers with sufficient skills to obtain and then hold a job as required by the CTC program. Glentz conceded that few employer contacts had been made in the past, but stressed that her chief concern was to remedy a significant lack of basic skills which, if left untreated, could seriously hamper any attempt to place these women in actual positions outside the prison. I find these efforts well suited to the needs and abilities of the general population at Huron Valley.

Nonetheless, I think it essential that Defendants begin immediately a comprehensive survey and analysis of the vocational needs and interests of the women at Huron Valley. As Plaintiffs' witness Chapman pointed out, a true reflection of the women's interests will be possible only after they receive assistance in understanding the kinds of occupational training available and the prospects for successful employment in various fields. In this sense, the results of Defendants' April 1979 survey are suspect because no systematic explanations were offered of the job characteristics of many occupations listed—e. g., millwright or metal molder. [Defendants' Exhibit 15.] I am unwilling to assume that this survey accurately reflects the desires of the female inmates and Defendants are, therefore, directed to conduct another survey which will attempt to cure these flaws.[9]

Furthermore, the survey should be preceded by intensive employment counseling and testing sessions with each inmate in order to determine as accurately as possible her needs and capabilities. At this time, information about the employment prospects in various fields can be exchanged so that the inmates may make a more informed decision about their own employment future. Needless to say, Defendants will be obliged to provide trained counselors capable of conducting this program successfully; the State, however, is free to decide whether it is in a better position to train its own employees for this task or to hire outside help. Witnesses for both sides expressed opinions, in which I concur, that a substantial amount of education and counseling is now required before the women will be in a position to exercise a meaningful choice between traditional and non-traditional occupational training.

b.

Training in five broad occupational areas is currently available at Huron Valley: office occupations, food service, graphic arts, building maintenance, and general shop.

**9.** In fairness to Defendants, I note that Michael Smail, principal at Huron Valley, characterized this survey as a measure of how hard he and his staff will have to promote non-traditional occupations to the Huron Valley women, and is not intended for future use as a guide to potential course offerings at the facility. I accept this explanation and add only that the degree of promotion required, as revealed by this survey, is additional evidence of the need for the counseling and testing program I have outlined above.

The building maintenance unit is generally a custodial techniques course which, until recently, was a prerequisite to any other shop course at Huron Valley. Prior to the installation of the general shop unit, building maintenance also included separate instruction on basic carpentry, small engine repair, tool technology (essentially a familiarization course), and basic welding. At the time of trial, it was revealed that a new course of instruction in general shop is to be introduced and would include experience with carpentry, plumbing, small engine repair, tool technology, basic electrical training, and welding. Neither the plumbing nor the electrical segments had begun at that time, however.

By way of comparison, male prisoners have access to some twenty different vocational programs, including automobile servicing, heating and air conditioning, machine shop, and drafting, among others.[10] Furthermore, evidence was taken indicating that the "male" versions of those programs now being taught at both male institutions and at Huron Valley were often more extensive and more useful to the inmates. For example, the food service program at Huron Valley was repeatedly described by prisoner participants as teaching non-commercial, short-order cooking skills. Similar opinions were given by Wilbert Laubach, Director of Education for the Department of Corrections, and Arlene Stabenau, a former instructor in food service at Huron Valley. At the State Prison of Southern Michigan, on the other hand, the food service program is designed for full commercial use. Similarly, the graphic arts unit at SPSM produces the prison newspaper *Spectator* as well as a variety of other publications. Women in the same program at Huron Valley produce personal calendars and other small projects; an institutional newspaper has only been published on a sporadic basis. The welding program at Huron Val-

ley, according to the testimony of instructor Joseph Wehrer, also compares unfavorably to its counterpart at SPSM. In general, the women described their programs as teaching elemental skills appropriate to the production of personal or handcraft items, and not typical of the skills required, for example, by the construction and industrial trades.

As a result of this evidence, I find that the women at Huron Valley are entitled to a greater variety of programming than they are currently offered. The actual courses to be added to those now taught, however, will depend on the results of the inmate survey. I emphasize that this survey is not a precondition to relief, but is actually part of the relief itself. If, after extensive counseling and education, the women decide that they prefer training in occupations traditionally performed by females, then the State must provide them with adequate programs in those areas whether currently taught or not. In the event that the women do not choose programs identical to those offered male inmates, the State will not be free to ignore their selections.

The women inmates have a right to a range and quality of programming substantially equivalent to that offered the men, and the programs currently offered do not meet this standard. But additions to that program should be based on the interests and needs of the female inmates rather than short-sighted efforts to duplicate the programs offered at male institutions. While, in many cases, equal treatment may safely be achieved by requiring identical treatment, I do not believe that, in this case, identical treatment is either wise or just.

I reach this conclusion bearing in mind the goals of rehabilitation and reintegration adopted by Defendants. Presently, vocational instruction at Huron Valley is an

10. Defendants' Exhibit 9 and Defendants' Answers to Plaintiffs First Set of Interrogatories, no. 22, list the full range of programs offered to males. Every male prisoner, of course, does not have access within his institution to each of these programs. But, aside from the possibility of transfer between institutions, the fact that any given male cannot participate in every program does not change the fact that men *as a group* have greater vocational opportunities than women.

active source of frustration and thus discourages inmate rehabilitation. Furthermore, the skills acquired by completing the courses are rarely sophisticated enough to permit placement above menial status on the outside; as a result, reintegration is hampered. As it is presently structured, the program offers too few opportunities, and those it does offer are of insufficient quality to meet the goals of the corrections system and the standards set by the Department at its facilities for male prisoners. By supplementing the program at Huron Valley with those additions suggested by the inmates, I believe that this standard will be met and the State's constitutional obligations satisfied.

c.

Joseph Wehrer, instructor at Huron Valley, testified that the area provided for instruction in general shop and maintenance techniques was confined and, in his opinion, unsafe unless the number of women using the room simultaneously was sharply restricted. Wehrer indicated that, although the newly-installed welding booths were also intended for simultaneous use, he would not permit more than one inmate at a time in either booth because of the danger involved. In addition, he noted that the usable space in the shop area was reduced by the requirement that a storage for wood and wood scraps be provided in the room itself. These conclusions were supported on my tour of the facility on April 23, 1979. The shop area and the working conditions there left a general impression of a large number of activities conducted in a cramped work area, particularly if the usual number of ten students were expected to make use of the room.

In addition, inmates gave testimony concerning the equipment and size of the kitchens used for food service instruction. Arlene Stabenau supported this testimony, referring to "home-use" equipment and the "mini-kitchens" she was obliged to use in conducting the course. Nothing I saw in any way undermined that testimony. Defendants, rather than vigorously contesting this testimony, adverted throughout the tri-al to a lack of funds for expanding the facilities or equipment used in connection with treatment programs.

I find that the facilities currently in use are inadequate to their purpose. The shop area, in particular, is unnecessarily, and perhaps dangerously, crowded. Defendants must begin plans for its expansion or the conversion of additional rooms in the prison for the use of building maintenance or general shop students. As with the addition of new vocational programs, Defendants may choose to await the results of the inmate counseling and testing in order to proceed as efficiently as possible with any other facility or equipment modification that might be necessary following the new survey results.

With respect to the facilities used for food service instruction, Michael Smail stated that the large, commercial-style kitchen located in a building adjoining the Huron Valley perimeter (and destined to serve the Huron Valley Correctional Facility for men in the future) is now being opened to the women for baking and salad preparation. If this use of the facility gives the women access to commercial-grade equipment and experience in commercial food preparation, the action satisfies the requirements in this area.

Finally, Smail and Wilbert Laubach testified that a data processing course had just recently been started at WCC, and discussions have begun with the Ypsilanti Skill Center for training interested inmates. Both testified that increased use of the Skill Center and WCC was planned in order to make use of their instructional personnel and equipment. These initiatives are wholly within the spirit of this decision, and I approve their continuation and expansion guided once again by the results of the forthcoming survey. As mentioned with respect to educational programs, transportation of qualified inmates to WCC or the Skill Center is an effective and efficient way of meeting the needs of the inmates, and such efforts should be maintained sub-

ject to the security considerations already raised.[11]

In addition to educational and vocational programs, other matters at Huron Valley have been challenged. Defendants have stipulated that the librarian at Huron Valley works on a part-time, volunteer basis, while the librarian at the State Prison of Southern Michigan (SPSM) is an employee of the Department. Huron Valley inmates testified also that educational assignments in WCC courses often had to be curtailed or waived because of the limited library resources at Huron Valley.

I am unable to conclude on this evidence that the women at Huron Valley are being discriminated against in this matter. The fact that the Huron Valley librarian is neither paid nor a full-time employee in and of itself is not conclusive. Similarly, a comparison to SPSM—a prison complex housing several thousand prisoners and containing a library many times larger than that at Huron Valley—while enlightening, cannot support Plaintiffs' contention without more. To the extent that the absence of a full-time librarian and allegedly inferior resources affect the practiced women's right to a substantially equivalent education, the State is already under a continuing duty to ensure that the woman are given that opportunity. Beyond that, I am unable to conclude on this record that the State is discriminating against its female prisoners in the manner suggested by Plaintiffs.

### d.

No apprenticeship training programs are available to women at Huron Valley. In contrast, male inmates at SPSM are offered potential apprenticeships in the following trades: millwright, machinist, machine repair, tool maker, tool and die maker, indus-

trial maintenance electrician, draftsman, and tool and die designer. In addition, these trades are practiced in connection with the prison industries program at SPSM. Defendants have also admitted that no apprenticeable positions will be available in either of the prison industries proposed for Huron Valley: the manufacture of furniture cushions and license plate validation tabs.

Plaintiffs' expert Elsie Dennison of the Women's Bureau of the United States Department of Labor testified regarding her experience with the establishment of apprenticeship programs at the federal women's prisons around the country. Her efforts, and those of her Department, have resulted in the creation of programs in auto mechanics, plumbing, painting, carpentry, stationary engineering, cosmetology, dental technician, electronics, and steamfitting. Her experience has been that a high interest quotient exists among federal women prisoners, particularly when the women are advised of the pertinent wage rates and the availability of jobs for women in the skilled trades as a result of federal employment requirements. While acknowledging that the programs are too new to supply accurate success data, Dennison stressed the interim benefits that accrue to prisoners, their families, and society in general in the event that more women begin entering the skilled trades job market.[12] Finally, in response to questions concerning the average two-year period of incarceration at Huron Valley, Dennison stated that while her Department's experience had been limited to longer term offenders in the federal prisons, certain benefits would fall to short-term offenders able to get into apprenticeship programs. Chief among them would

---

11. The suggestion in the Proposed Budget for 1980 that off-site vocational programs will be cut or held to present levels as a result of budget reductions has not been verified in testimony. As with all such matters, however, I remind Defendants that the actions directed in this opinion are based on the State's constitutional duty to the inmates and have, therefore, the highest priority.

12. When questioned about the relatively small number of women in federal apprenticeship programs, Dennison pointed out that there are only six thousand women in apprenticeship programs throughout the country, and that extensive education and counseling prior to participation is crucial. Dennison noted also that Huron Valley, with approximately four hundred inmates, is a large institution as far as women's prisons are concerned.

be the transferability of apprenticeship credit hours to programs on the outside and the value of receiving almost any amount of professional training in these fields.

Currently, there are no prison industries at Huron Valley, although there is some evidence on the record that the State plans to manufacture furniture cushions and license plate validation tabs at some point in the future. Prison industries are conducted, on the other hand, at four male institutions.[13] The chief advantage of work in a prison industry lies in the higher wages that are paid including the opportunity to earn substantial bonuses as a result of profits earned by the industry.[14] From the State's point of view, prison industries are useful for supplying equipment or goods needed by the system at a lower cost than would be available on the open market. In addition, of course, the State can use industry employment to supplement its vocational apprenticeship training programs, and to provide additional jobs for its inmates.

Prison industries are authorized by the Correctional Industries Act, M.C.L.A. §§ 800.321–800.335. As I have discussed earlier in a more general context, the purpose of the act is to provide "adequate, regular, diversified, and suitable employment" for inmates, to obtain reimbursement for the expenses of imprisonment, and to control the economic relationships between state-operated correctional industries and competing segments of private industry. M.C.L.A. § 800.331. In addition, the legislature has set priorities to guide the Department in its selection of the kind of industry to be installed at a given location. M.C.L.A. § 800.327. The corrections commission is instructed generally to provide "as fully as practicable for the employment of inmates in tasks consistent with the penal and rehabilitative purposes of their imprisonment and with the public economy." Id.

The highest single priority is assigned to "Routine, maintenance and constructive activities" at each institution, again with an eye to correctional and rehabilitation goals. Following these services, the legislature has given priority to "educational and rehabilitation activities, whether formal or through productive or socialized activities, determined on the basis of individual needs and educability." Id. The Department is then directed to provide inmates with labor on institutional farms, shops, or factories for the production of goods and services "properly required for the maintenance and operation of or for consumption in the correctional institutions of the state . . . ." Id. Finally, prisoner labor requested by the governor or heads of local government for work on public property is also permitted.

Aside from reinforcing the overall correctional goal of rehabilitation, these provisions clearly place great emphasis on the creation of prison industries relevant to the inmates themselves. In fact, apart from the labor required to maintain the institution itself, the statute places higher priority on "educational and rehabilitative activities" than on any other purpose, including the production of goods for distribution within the correctional system and to other units of government.

The fact that the State has decided to operate a prison industries program for its own benefit, and that of its male prisoners exclusively, requires that female inmates now be given similar consideration. Although the Act itself does not mandate the

---

**13.** SPSM—chair manufacture, metal furniture manufacture, industrial maintenance, license plate manufacture, textile and shoe factories, and a sign shop.

  Michigan Reformatory—cotton garment manufacture, laundry, maintenance, wood furniture manufacture.

  Marquette Branch Prison—Work garment manufacture.

Kinross Correctional Facility—metal office furniture manufacture. The speed of implementation at Kinross is the result of the Department's ability to purchase two quonset huts already on site from the Federal Government which the State will use to house the industry.

**14.** See Dimensions, Plaintiffs' Exhibit 10, pp. 92–93.

creation of prison industries,[15] the State has assumed that responsibility with respect to one segment of its prisoner population; in that event, the Act does then impose certain principles on the operation of a prison industry program. In particular, the legislature has placed strong emphasis on the educational and rehabilitative purposes of the program. The State, therefore, must review its proposals for the prison industry it intends to locate at Huron Valley and consider alternatives which may reflect these legislative priorities more accurately.

Because the apprenticeship training provides both educational and rehabilitation opportunities, I suggest that the prison industry be selected with apprenticeable positions in mind. Once the survey is completed, both apprenticeship programs and related (or compatible) industries can be selected in light of the express choices of the women inmates. If no feasible connection can be made between the various prison industries and the available apprenticeship training programs, then the training may be linked to existing vocational programs at Huron Valley—e. g., graphic arts, food service, or general shop—assuming a demonstrated interest exists among the inmates. In either event, the State can then proceed immediately with representatives from the Bureau of Apprenticeship and Training to organize an apprenticeship program at Huron Valley.

e.

In connection with the discussion of prison industries, Plaintiffs have claimed that women inmates given a work assignment earn less than male inmates assigned to similar functions at other institutions. Testimony was offered concerning the wages paid at Huron Valley and a chart comparing male and female wages was submitted by a male prisoner at the Michigan Training Unit.

Defendants presented evidence documenting the Department's decision in 1976 to implement a standardized wage scale throughout the system.[16] Toward that end, all inmate job assignments were ordered reclassified into nineteen job categories of varying job levels. Each one of the five job (or wage) levels contains three sub-levels which reflect the inmate's tenure and his or her performance in that position. In general, the level at which a work assignment is classified depends on a set of five characteristics, each characteristic being given a point value depending on the degree to which that factor relates to the job in question.

In a memorandum from Robert Brown, Deputy Director of the Bureau of Correctional Facilities, dated October 27, 1978 [Defendants' Exhibit 2], the following statement appears: "When completing the ratings the work assignments are to be rated and not the individual in that assignment." He goes on to describe the differences between large and small institutions which could result in a different point total for the same work assignment and, consequently, a different wage. Such size-linked differences may include the number of people supervised, the degree of skill or training required, and the length and kind of experience necessary to perform a particular task.

Plaintiffs attempted to demonstrate that, despite the ostensibly neutral rating criteria described in the policy statement, certain work assignments at a comparable institution (Michigan Training Unit) were given a higher job level than the same or similar work assignments at Huron Valley. For example, Plaintiffs introduced an MTU in-

---

**15.** "The state corrections commission *may*: (a) Use, equip, and maintain buildings . . . and equipment . . . to provide for the employment of inmate labor . . . for the manufacture of goods . . . and the operation of services." M.C.L.A. § 800.324 (emphasis supplied).

**16.** I interpret the Departmental policy as amplifying the provisions of 1954 MAC, R 791.-4435(6) regarding wage classifications at correctional institutions. But aside from the general authority given to the Director to promulgate regulations for the management of the correctional system, M.C.L.A. § 791.206, the legislature refers to the matter of prisoner wages only insofar as prison industries are concerned. *See* M.C.L.A. §§ 800.325, 800.332.

mate who testified that as an editor of the prison newspaper he was given the highest job level classification available in the system, and that others on the staff were also paid although at lower levels. In contrast, a Huron Valley inmate testified that she was an editor of the Huron Valley publication and the only paid member of the newspaper's staff. Other evidence in the record established that no position at Huron Valley has been classified at the highest of the five levels.

It is clear that this kind of wage discrimination is a consequence of the generally lower quality of the programming and facilities at Huron Valley, as well as the size of the institution. A lower level of funding, for example, produces a weaker and less challenging program or related work assignment. As a result, even a truly neutral job classification procedure, applied objectively, will assign that position to a lower wage level than its counterpart in a stronger, well-funded program (usually in a male institution). The fault, therefore, lies in the underlying commitment to programming at Huron Valley and not necessarily with wage standardization. Although I do not find sufficient evidence on this record to hold that the wage classification procedure is unconstitutional as it is currently applied, the discrepancies between the wages paid to female and those paid to male inmates require serious attention. These discrepancies should diminish or disappear entirely, however, when the additional work-related programs described earlier are implemented at Huron Valley, and the quality of work within the institution rises accordingly.

f.

As described by Defendants, work pass is a program available to qualified male inmates which permits them to leave the institution during the day to work for a private employer at the wages prevailing on the outside. The inmate returns to his cell

each night, and his employment may terminate upon release from the institution. The Department has also established community treatment centers (CTC) for both male and female inmates throughout the state. Each center is limited to a small number of inmates who are completing the last phase of their incarceration. Once assigned to a center, the inmate finds employment on his or her own and may continue to hold that job past the date of discharge.

Plaintiffs claim that the absence of a work pass alternative at Huron Valley [17] violates the equal protection clause. Women inmates stated that in the past they have elected to remain at Huron Valley rather than accept what they consider to be the less desirable alternative of placement at a treatment center. Defendants profess not to understand the women's desire for a work pass alternative. Director Johnson stated that the Department prefers the treatment center because of the resident's greater involvement in the community, and the work pass program for male prisoners is merely a means of achieving at least a limited number of treatment goals given that eligible male inmates outnumber openings at the centers. Thus, while the general goal of economic self-sufficiency is achieved by both programs, only the treatment center offers the additional advantage of community reintegration and adjustment.

Kathy Glentz, employment counselor at Huron Valley, did state that a work pass program had been started at Huron Valley at one point, but was halted on the verge of implementation due to concerns about state furlough restrictions. See M.C.L.A. § 791.-265a; 1954 MAC, R 791.4410–R 791.4425 (Supp.1978). The program was apparently never reinstated with the exception of the Plymouth Center effort. Furthermore, Glentz stated that the current Huron Valley policy is to release the women directly to the CTCs at the point they would otherwise become eligible for work pass placement.

17. Actually, a group of thirty-five inmates does leave each day for work at the Plymouth Center for Human Development. The program is a kind of hybrid inasmuch as the women partici-

pate as trainees and can achieve Civil Service status on completion and release. This is the only contact presently with outside employers.

Defendants argue, therefore, that no prejudice inures to Plaintiffs, and that these policies are consistent with the Department's objective to place its prisoners in the least restrictive environment as soon as possible.

On the other hand, several women inmates expressed their preference for work pass on the grounds that some treatment centers are located in poorer, unsafe neighborhoods requiring them to return to the environment which fostered their criminal behavior in the first place. In addition, they cited the strict regulations in force at each center as the basis for their unwillingness to move to the centers when eligible. Release dates can be jeopardized by a slight or inadvertent violation of the curfew rule, for example, and women can be returned to Huron Valley as parole violators or "escapees". David Fogel testified that, in his opinion, an inmate population cannot be treated as an undifferentiated whole, and that prison officials must recognize that the needs of some inmates differ from others. Thus, in his view, both alternatives should be maintained in order to meet the needs of all inmates.

I find that work pass is a desirable program with substantial rehabilitative possibilities for qualified inmates preparing for release. In this context, I find no sufficient reason to deny the women inmates an opportunity to participate. Assuming there are some inmates unwilling or unable to adjust successfully to the treatment centers, the absence of an alternative to regular incarceration at Huron Valley may actually hinder rehabilitation. The State is directed, therefore, to begin exploratory contacts with local employers with whom these women could be placed prior to the termination of their custody.

In a similar vein, the correctional camps program permit qualified male inmates to live at camp sites in several locations throughout the State in barracks-type accommodations while doing work for the Michigan Department of Natural Resources. (DNR) See M.C.L.A. § 798.351. Aside from the opportunity to live in a non-institutional setting, the program also permits the men to earn incentive good time, thereby reducing the period of their incarceration. Women inmates in the State of Michigan do not have a similar program available to them, nor do they have the opportunity to earn incentive good time.

Rudolph Stahlberg testified that the Department has attempted to arrange a women's camp program with the DNR, but that the agency had expressed reservations and there were difficulties finding DNR projects within the standard commuting time of potential camp locations. In addition, Stahlberg stated the Department's position on the non-institutional placement of female inmates at some length. Presently, thirty percent of the female prisoner population are in treatment centers or other residential homes by virtue of their meeting the Department's qualifications for community release. Only ten percent of the men, on the other hand, are given similar placements, while another ten percent reside in correctional camps. Stahlberg testified that once the CTC placements are made, an insufficient number of women with the appropriate security qualifications remain at Huron Valley who would be eligible for a correctional camp assignment. By way of comparison, the men are faced with a relative lack of available CTCs, hence the camps offer an alternative to institutional incarceration for those who (but for the shortage) would be placed at the centers. Here, too, the Department emphasizes the CTCs, as opposed to other forms of non-institutional incarceration. Nonetheless, Stahlberg did state that plans were being formulated for the establishment of at least one correctional women's camp in the future.

I find that, as with the work pass program, women are entitled to participate in this program. Neither the statute authorizing this kind of inmate labor nor the administrative rules distinguish between male and female prisoners. In deciding that female inmates should have the opportunity to participate in the camp program, I have considered the statements made on this record

concerning the State's continuing efforts to find a suitable location for a women's camp. That search should continue, but, in the meantime, the State is directed to consider other means by which women who would otherwise be eligible for the camp program now be permitted to earn incentive good time in some appropriate fashion. When that occurs, the women will then have access to a range of incarceration alternatives substantially similar to that available to the men at the point their security status enables them to choose the kind of custodial situation best suited to them.

## II

■ In 1977, Charmaine Cornish and Georgia Manzie, inmates at Huron Valley,[18] filed a class action seeking a declaratory judgment and damages based on an alleged denial of constitutional rights by the Michigan Department of Corrections and certain of its officials. Plaintiffs claimed that their rights to equal protection and their right to access to the courts have been violated by Defendants' failure to provide the female prisoners at Huron Valley with an adequate law library comparable to those provided for male prisoners.

On March 17, 1978, I entered an Order consolidating this action with *Glover v. Johnson*, Civ.Act. No. 77–71229 because similar claims had been raised in that case, *see* Amended Complaint, ¶ 34, and I deemed it advisable to hear them together. Plaintiffs Cornish and Manzie appealed, but the United States Court of Appeals for the Sixth Circuit affirmed on November 1, 1978. *Cornish v. Johnson*, No. 78–1230. Since that time, Plaintiffs have appeared pro se on several occasions for the purposes of examining witnesses pertinent to their claim and making their final argument. For the limited purpose of preparing and filing a post-trial brief, I appointed counsel representing the Plaintiffs in *Glover* to aid Plaintiffs Cornish and Manzie at their own request.

### A

Plaintiffs state in their complaint that the law library at Huron Valley was inadequate because it lacked federal reporters, federal and state digests, a federal law treatise, and legal forms. In addition, Plaintiffs claim that they had been denied all access to the law library for the period in 1977 in which the move from the Detroit House of Correction to Huron Valley was being effected. Plaintiffs assert also that the lack of a paralegal training program similar to that conducted at the State Prison of Southern Michigan (SPSM) denies them access to the courts and violates the equal protection clause.

In response, Defendants argue that the law library at Huron Valley meets the minimum standards promulgated by the Department, and that the paralegal program at SPSM is designed primarily to provide legal services to the inmates there and not to train prisoners in legal research and writing skills. In light of the recent assignment of an attorney to Huron Valley to handle prisoner claims, Defendants assert that the women have no basis for alleging any denial of their constitutional rights.

Without deciding this point, I note that the evidence tended to demonstrate that the law library for women at the Detroit House of Correction did not meet the State's minimum standards at any time prior to the move to Huron Valley. Following the move and the disruption in services, it appears that the library was brought into compliance. Difficulties may remain, however, with the absence or unavailability of certain volumes from time to time as well as the fairly serious matter of keeping the materials up to date. On my visit to the facility, for instance, I noted that the most recent editions of Shepard's available were not current issues and, thus, were of limited value to the women. Although other male institutions have libraries comparable to Huron Valley's, it is true that the central

---

**18.** Plaintiff Manzie has since been released to a Community Treatment Center and is no longer housed at Huron Valley. In view of her claim for damages arising out of her incarceration there, however, I do not consider her claims mooted by her change in custody.

complex law library at SPSM is significantly larger.

One of the factors behind that situation at SPSM is the manner of funding. The State pays for the volumes required to bring a law library up to its own minimum standards. After that point, all additions to the libraries are paid for by the inmates through the Resident Benefit Fund. Contributions to the Fund come principally from sales of commissary items, and Director Johnson stated that contributions to the Fund at SPSM average $10,000 per month, while contributions at Huron Valley only reach $300 per month. Consequently, male prisoners at SPSM have a much greater amount of money to spend on the library, and they appear to do so regularly to great advantage.

Testimony concerning the paralegal programs indicated that the program at SPSM was originally designed to provide legal services to the inmates as well as offer some vocational training for the selected prisoners. At the time of trial, Prison Legal Services of Michigan, Incorporated (PLS), the organization responsible for administering the program, had two attorneys, three full-time paralegals, and approximately twelve trainees involved in the program, in addition to occasional assistance from outside attorneys from the State Appellate Defender's Office and other organizations. Services offered by PLS are limited by contract: no civil rights suits against the Department, no criminal appellate work otherwise within the province of the Appellate Defender or other court-appointed counsel, nor any fee-generating cases may be handled by PLS. Finally, Director Johnson stated that an attorney from PLS had been assigned to Huron Valley and will soon provide the same services there as are available at SPSM.

The women at Huron Valley do not have a paralegal training program. The only training similar to this was given as part of the legal research class conducted by Washtenaw Community College. But students and one teacher of the class testified, however, that the class did not attempt to teach the sort of research and writing skills necessary to prepare legal briefs. In fact, Plaintiff Manzie admitted that, notwithstanding her participation in the program and volunteer work as a law librarian, she still required the assistance of an SPSM inmate in order to complete a state court appeal. Other women also stated their belief that completion of the WCC course did not adequately equip them for the task of preparing their own litigation.

### B

In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court held that a prisoner's constitutional right of access to the courts required that the State provide an adequate law library or qualified legal assistance in the preparation of his or her suit. *Id.* at 828, 97 S.Ct. 1491. In affirming the lower court decision, the Court in effect approved the list of required legal materials proposed in that decision. *Smith v. Bounds*, 538 F.2d 541, 544 n. 2 (4th Cir. 1975); *see Bounds v. Smith, supra*, 430 U.S. at 819 n. 4, 97 S.Ct. 1491. The Court emphasized that the obligation to provide meaningful legal assistance to prisoners does not preclude local innovation (such as paralegal training) designed to achieve the same goal. *Id.* at 830–32, 97 S.Ct. 1491.

Defendants argue that the law library at Huron Valley meets the *Bounds* criteria for "adequacy" and that compliance has been doubly assured by the recent assignment of a PLS attorney to Huron Valley. They claim, therefore, that they are obligated to do no more, and that Plaintiffs' demand for a paralegal program exceeds Defendants' constitutional duty in this area.[19]

---

**19.** Defendants also argue that Plaintiffs misconstrue the intent of the paralegal program. While the program in part was intended to teach job skills to certain inmates, Defendants state that the vocational aspect has largely proved unsuccessful. The program has been continued, nonetheless, for two reasons: (1) the principal purpose of the program is to provide legal services to inmates and that aspect has been an unquestioned success, partly due

I find that the Huron Valley law library currently meets the standards set in *Bounds.* This decision obviously assumes that these volumes will be supplemented and replaced periodically as required to keep them up to date, and that any missing volumes will be replaced immediately. But I do not believe that because SPSM has a much larger library that Plaintiffs can fairly claim that the State discriminates against them by declining to supplement the minimum list at Huron Valley in an effort to match the SPSM collection. The policy of funding the minimum collection from State revenues and permitting additional material to be purchased from the Resident Benefit Fund is equitable on its face and as applied.

In this matter, I do consider the size of the relative prison populations to be relevant. More important, I cannot find the same degree of State direction and involvement in the expenditure of benefit funds that I find, for instance, in the provision of educational and vocational programming. To the contrary, the inmates themselves have a substantial voice in these matters, and those at SPSM have apparently chosen to spend a portion of their funds on their law library. The State would be no more implicated if the inmates had chosen some other way to spend their money and permitted the library to remain at minimum standards. The State cannot be made to do for the women at Huron Valley what the men at SPSM have willingly chosen to do for themselves, notwithstanding the substantially greater resources at their disposal.

But the provision of a satisfactory law library does not settle this issue. The adequacy of a prisoner's right of access to the courts must be measured by the actual opportunity he or she has to raise a valid and meaningful claim before the courts. *Stevenson v. Reed, infra.* In *Wolff v. McDon-*

*nell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Court expanded on this theme:

> The right of access to the courts . . is founded on the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. . . .
> The recognition by the Court that prisoners have certain constitutional rights which can be protected by civil rights actions would be diluted if inmates, often "totally or functionally illiterate," were unable to articulate their complaints to the courts.

*Id.* at 579, 94 S.Ct. at 2986.

In this respect, Defendants' position that they are obligated only to provide *either* an adequate law library *or* qualified legal assistance is too narrow a reading of *Bounds.* An adequate library cannot provide meaningful aid to a prisoner unschooled in the most basic techniques of legal research. As a result, courts have recognized the need for the assistance of others who possess these skills in order to render the inmate's right to access effective. *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Wolff v. McDonnell, supra; Stevenson v. Reed,* 391 F.Supp. 1375 (N.D.Miss. 1975), *aff'd,* 530 F.2d 1207 (5th Cir. 1976), *cert. denied,* 429 U.S. 944, 97 S.Ct. 365, 50 L.Ed.2d 315 (1976).

> Keeping in mind that the judicial touchstone in this area is "adequate access to the courts", it is obvious that a prison library, even where it is adequate, is insufficient to provide that access for inmates who are illiterate or otherwise unable to do effective legal research.

*Wade v. Kane,* 448 F.Supp. 678, 684 (E.D. Pa.1978), *aff'd,* 591 F.2d 1338 (3d Cir. 1979).

Defendants' position would be more persuasive if the legal assistance now of-

---

to the assistance rendered by trained paralegals; and, (2) the Department is interested in learning whether these legal services can be supplied more economically with the continued participation of inmate paralegals than with the aid of additional lawyers hired from the outside.

My decision here makes it unnecessary for me to decide whether Plaintiffs have a right to paralegal training viewed strictly as another aspect of the vocational training issue and, therefore, I do not address this aspect of their claim.

fered by PLS could encompass all matters relating to the women's incarceration. But, in limiting PLS services as it has, the State in effect requires its inmates to look elsewhere for assistance, particularly with respect to civil rights matters.

Male inmates are not disadvantaged to the same extent as females, however, because of the existence of experienced writ writers at SPSM and other institutions who are able to frame an inmate's complaint in constitutional terms well enough for presentation to a state or federal court. Women inmates have not yet developed this expertise due, in part, perhaps to the apparent unavailability for many years of sufficient legal resources at the Detroit House of Correction. One consequence of this situation has been the use by women inmates of those male prisoners willing to offer them legal assistance by correspondence.

I consider this to be an unnecessary burden on the women's right to access. A female inmate does have a right to communicate with someone able to present her complaints to the courts. *Stevenson v. Reed, supra.* In particular, where assistance from state-supplied attorneys is not available, inmates have a constitutionally protected right to consult with other inmates. *Johnson v. Avery, supra; Matter of Green,* 586 F.2d 1247 (8th Cir. 1978), *cert. denied,* 440 U.S. 922, 99 S.Ct. 1249, 59 L.Ed.2d 475 (1979); *Buise v. Hudkins,* 584 F.2d 233 (7th Cir. 1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979). Since PLS attorneys and staff members cannot assist inmates in certain matters, I believe that State inmates have a constitutionally protected right to seek each other's assistance in these areas.

Plaintiffs' claim for paralegal training is best understood in this context. As Defendants have noted, the chief virtue of the training program lies not in its vocational aspects, but in its value as a means of providing legal services to inmates. That value is even greater in view of the contractual limitations placed on the PLS attorneys and staff—in particular, the bar on civil rights actions against the Department and the limitations on criminal appellate work for inmates. Obviously, these are two of the most critical areas of the law to prisoners. It is here, if anywhere, that an inmate will suffer most drastically the impairment or loss of her constitutional rights if she is not able to assist herself and has access to no one able to help her.

In order to protect the inmates' right to access, I find that the State should continue the PLS effort at Huron Valley. Furthermore, a legal education course should also be implemented in order to train the female inmates to help themselves and each other in the presentation of their claims to the courts. While the State is free to devise a new course of study to meet this need, the paralegal program currently taught at SPSM is a logical and proven model.[20]

The possibility that women may also acquire marketable skills, while clearly beneficial, should not be confused with the program's constitutional objective. The program is justified, not because a similar program is offered at SPSM, but because skilled women inmates are needed to provide meaningful access to the courts. Unlike the male population generally, the women do not have a history of self-help in the legal field; the evidence tends to show that until recently they have had little access to adequate legal resources. Until that goal of meaningful access is reached, the training must continue at Huron Valley whether or not the State decides to maintain the paralegal training program at SPSM.

Having determined the liability of Defendants to Plaintiffs in this matter, I must

---

**20.** Any inmates who begin work as paralegals within the PLS program at Huron Valley may be barred like the attorneys themselves from providing civil rights and criminal appeals assistance. But this consideration emphasizes the purpose of the proposed course in legal research. In addition to the paralegals who go on to work with PLS, the course will produce a pool of adequately trained inmate assistants among the female population who will then be able to assist themselves and others in areas where PLS is now prohibited from participating.

resolve the issue of damages. At an earlier point in these proceedings, I limited Plaintiffs' proofs to matters going directly to the issue of liability on the grounds that damages would become relevant only if a finding of liability was made. Plaintiffs, therefore, must now be given an opportunity to prove such damages, if any, as were caused by the State's denial of their constitutional rights, and a hearing for that purpose will be held at a date to be set by the court.[21]

## III

### A

Even before the opening of Huron Valley in 1977, it became clear that the facility designed to accommodate 270 inmates would be seriously overcrowded. Consequently, a contract was executed between the Department of Corrections and Kalamazoo County Jail (KCJ) to house the overflow. At present, approximately fifty to fifty-two women are currently placed at the jail. The selection procedure, only recently reduced to written form, was described by Jeanne Speier, Deputy Superintendent at Huron Valley. In effect, all new arrivals at Huron Valley—that is, those with less than ninety days in residence—who have received medical and psychiatric clearance and who are not due for immediate court appearances and the like are subject to assignment to the jail. It is clear, however, that the overriding concern is the overcrowding endemic to Huron Valley and these factors may be waived or ignored if it is necessary to reach the "safe" capacity of Huron Valley (currently, around 390 inmates). Thus, women who have been at Huron Valley longer than ninety days, some with medical or psychiatric problems, and even those who have returned to Huron Valley from a previous rotation may be assigned to the jail. Speier also testified that a work or school assignment would not be sufficient cause to withhold an inmate from the jail rotation.

The average stay at KCJ is currently about nine to ten weeks, although in the past women have been confined there longer; State personnel have indicated a desire to keep the rotation as short as possible. In order to determine which women at KCJ will be rotated back to Huron Valley, the jail administration has devised a point system based on an inmate's behavior and the length of time she has been housed at KCJ. Although new arrivals are counseled about the point system and its general relation to misconduct, copies of the point system are not distributed to them.[22]

### B

Women at KCJ are housed in either six-person, four-person, or individual cells. Plaintiffs' expert David Fogel testified that on a personal visit to the jail he determined the cells' floor dimensions to be approximately 20' x 17', 20' x 10', and 6' x 9' respectively. Each of the women is provided with a steel, springless bunk on which she places

---

21. At this hearing, Plaintiffs will be permitted to reintroduce their evidence relating to the conditions of the law library at the Detroit House of Correction insofar as it relates to the denial of their rights at the time—a matter which I specifically do not address in this opinion. Defendants, of course, will also be permitted to meet the issues raised by these proofs.

In addition, I note that, although Plaintiffs' action was brought on behalf of all women inmates similarly situated, it has not yet been determined to be a proper class action. I note that a similar claim was raised in *Glover v. Johnson*, Civ.Act. No. 77–71229 [Plaintiffs' Amended Complaint, ¶ 34], with which this case was consolidated in March 1978. *Glover*, of course, was later certified as a class action, but counsel in that case deferred to Plaintiffs Manzie and Cornish with respect to the law library issue. Under these circumstances, I do not believe it necessary to certify a class in this action.

22. In the words of the Kalamazoo Defendants, "a copy of the point system is not given to them since it would be just like giving the answers to a test before the test is given." Final Argument and Brief of Defendant Sheriff Clyde Graven, 2. Aside from the questionable characterization of incarceration at KCJ as a "test," I find the asserted justification perplexing in every respect. Surely the women have a right to know what is expected of them and what behavior will speed their return to Huron Valley. An inmate's motivation ought to be of no concern to the jail administration so long as it produces exemplary behavior.

her mattress. Lighting is only available from the area outside the cell and is never turned off. Floor area is diminished by a steel table and attached bench placed in each cell for dining, as well as by the mattresses of those women who lie on the floor in an attempt to read by the outside light. No shelf space is provided for personal possessions; such items are placed on the unused bunks or on the cell bars. No televisions, radios, or in most cases hardbound books are permitted in the cells.

The women are given a two-piece jail uniform to wear which is laundered regularly by the administration. In addition, they are permitted to wear their own underwear and sleeping garments. When personal laundering becomes necessary, women wash their clothes in the cell's washbasin and hang them to dry on lines strung between the bars of the cell. Fogel also testified that on his visit each cell had an open commode and shower. In accordance with an order of this Court issued in mid-trial, curtains are now hung concealing these areas from general view.

Programming of any kind is either limited or non-existent at KCJ. For example, while there is an average of two to three hours of recreation a week for State women, no vocational programs are offered, and educational efforts are confined to GED courses, some individual study if requested, and personal and group counseling. Church services and evening television are the principal means of diversion. There are only six to eight jobs available at KCJ for State inmates, and those women who have volunteered to remain at KCJ for personal reasons are apparently given priority in this area. In sum, State inmates may spend some twenty to twenty-two hours a day in their cells even if they take reasonable advantage of available programs.

Visitation is limited to three thirty-minute individual visits a week, and no contact between inmates and visitors is permitted. Telephone privileges are similarly limited to a weekly five-minute collect call. Defendants indicated that special arrangements can be made for visitors from distant areas and that high budget priority has been assigned to renovations that would permit contact visitation in the future.

### C

In order to select the proper standard by which to judge the treatment of Plaintiffs at KCJ, it is necessary to determine the facility's role in the correctional system and what responsibility, if any, the State has for the treatment of its inmates that are housed there.

The State has conceded that KCJ is a "temporary placement for women and is not considered to be a Department prison facility." Defendants' Reply Brief to Plaintiffs' Post-Trial Brief, 12. Perry Johnson, Director of the Department, testified in support of that position, stating that the contract with KCJ was a temporary measure until another State facility for female felons could be opened.[23] Further, the regulations promulgated by the Department pursuant to its statutory duty to supervise and inspect local jails, M.C.L.A. § 791.204(c), clearly distinguish facilities like KCJ from those operated and maintained by the Department itself. Cf. Rule 791.503(3) (Supp. 1975) with Rule 791.1101(e), (f) (Supp. 1978).[24]

---

23. Director Johnson indicated that an option had been taken on property in the western part of the State for this purpose. It now appears, however, that the option has been permitted to lapse and that any new facility is still in the earliest planning stages.

24. The tentative suggestion raised by Defendants at one stage that *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), might sanction the transfer of women from Huron Valley to KCJ can, I believe, be rejected on the basis of my finding here that KCJ is not a part of the state corrections system on the

order of Huron Valley or other State-operated institutions. Similarly, under these circumstances, I do not believe that the assignment of women to KCJ qualifies as an "inter-facility transfer." Rule 791.4401(6)(b).

I emphasize, however, that this portion of the case does not rest on whatever constitutional interests, if any, that *Plaintiffs* may assert on their own behalf with respect to their transfer from Huron Valley to KCJ, but rather is based on the obligations and duties of the *State* to its own prisoners wherever located.

■ The fact that KCJ is not a State institution does not end the matter, however. The State's obligations with respect to the incarceration of its prisoners cannot be shaped merely by the limitations of the particular institution or facility in which they are confined. Rather, the State has a duty to the individuals it incarcerates under its own auspices, wherever it chooses to house them. The fact that the State has secured space in KCJ for its women prisoners does not enable the State to exercise less responsibility for their custody and care, or to delegate that responsibility to local officials without taking steps to ensure that State prisoners are treated in a manner consistent with the State's own obligations to those prisoners. In short, whatever the State is obligated to provide its female prisoners in State-operated institutions, it is obligated to provide at KCJ.

[T]he Legislature has created the Department of Corrections for the purpose of concentrating with that department the primary (but not exclusive, of course) responsibility for the well-being as well as the disciplinary rehabilitation of state-sentenced prisoners, whenever such prisoners are held in any penal institution over which Corrections has jurisdiction and the power—whether exercised or not—to promulgate rules and standards relating thereto. *No matter where Corrections may choose lawfully to incarcerate or permit incarceration of any such prisoner, its duty to him [or her] remains constant and may not be subject to delegation, whether or not others are concurrently accountable for breach of the same or a corresponding legal duty.*

*Green v. Department of Corrections*, 386 Mich. 459, 465, 192 N.W.2d 491, 494 (1971) (emphasis supplied).

The scope of that duty has been described at length in this opinion with respect to rehabilitation programming and related matters, and that discussion is specifically incorporated here. In addition to the areas discussed, the Department has provided for other conditions of confinement, including recreation, Rule 791.6637(5), visitation, Rule 791.6607, and housing and living standards, Rule 791.6641. Without deciding separately each issue raised by Plaintiffs, I find sufficient and largely uncontroverted evidence on this record to support Plaintiffs' allegations. I find, therefore, that the conditions of confinement at Kalamazoo are markedly inferior to those at Huron Valley and, by failing to meet its self-imposed requirements for the confinement of its female felons, the State has breached its statutory duties to the inmates at KCJ.

In so deciding, I specifically do not reach the Eighth and Fourteenth Amendment issues raised by Plaintiffs, believing that, even if those conclusions could be drawn from this record, they are not necessary to achieve certain relief. The State's obligations here can be met perhaps in several ways, including the two most obvious choices of raising the standard of confinement at KCJ or simply stopping its use of that facility altogether.[25] The State is free to devise whatever plan it considers best suited to its needs and those of the KCJ State inmates, provided the plan can be readily implemented and meets the conditions set forth above.

---

**25.** For the purposes of this decision, I may assume that the language of M.C.L.A. § 791.-212(1) permits the process *per se* of contracting for the care of state prisoners with local facilities:

The [corrections] commission shall be a body corporate, and may lease lands under its jurisdiction, grant easements over, through, under, or across those lands for a lawful purpose, *and do any other act necessary to carry out this act.* [Emphasis supplied.]

Under normal circumstances, making such contracts in furtherance of the operation of the department may be within the scope of this section, and arrangements for the purpose of relieving overcrowding may also be permitted, *cf.* Rule 791.4401(b)(6). Nonetheless, without deciding the merits of that question, I believe the manner in which those ends are achieved is critical and that is where the State has faltered in this case.

## CONCLUSION

In this suit by the women prisoners of the State of Michigan against the Department of Corrections and others, major challenges have been made to the treatment programs made available to the women at Huron Valley, the limitations placed on Plaintiffs' rights of access to the courts, and the State's use of the Kalamazoo County Jail to house female State prisoners on a rotating basis.

First, Plaintiffs in this case have presented clear evidence that the rehabilitation opportunities afforded them are substantially inferior to those available to the State's male prisoners in terms of both the quality and variety of programming offered. By providing them with fewer and poorer educational and vocational programs, as well as less adequate facilities and equipment, and by denying them access to supplemental programs like work pass and incentive good time, the State has unnecessarily deprived women inmates of valuable rehabilitative experience.

The treatment of women prisoners described here violates the Equal Protection mandate of the Fourteenth Amendment. While it is neither feasible nor wise to require identical treatment of male and female inmates by the State, I do believe that the Constitution requires a greater degree of parity in rehabilitation programming generally then the State has accomplished over the years. In order to remedy the imbalance in the State's administration of its corrections system, I have directed that steps be taken immediately to determine the actual educational and vocational interests and capabilities of the female prison population.

But this expression of interest must be informed. The women must be first given the chance to learn about possible vocational and educational experiences before making a considered and thoughtful selection that meets their own needs and desires. Their choices will then guide the State in its efforts to establish a general program that will be substantially equivalent to that now offered male prisoners.

Second, the record demonstrates the constitutional inadequacy of the assistance given by the State to ensure the free exercise of the women inmates' right of access to the courts. Therefore, the State is directed to begin a legal studies course—in addition to Prison Legal Services and the existing law library—in order to guarantee the women's right to seek a complete range of judicial relief.

Third, Plaintiffs have argued that the State's use of the Kalamazoo County Jail violates the First, Eighth and Fourteenth Amendments. In this opinion, I do not reach these issues in view of my conclusion that the use of the Kalamazoo facility is prohibited by the mandate of the State legislature to the Department of Corrections. Further, the conditions at Kalamazoo clearly do not meet the Department's own standards for the housing and treatment of State inmates. Therefore, without deciding the constitutional issue, I am able to determine that the temporary housing of State female prisoners at Kalamazoo County Jail under these circumstances must be halted.

The State's responsibility for the care of its female prisoners must be defined by the goals and principles announced by the Department of Corrections and applied to the inmate population generally. Inasmuch as the facilities at Kalamazoo County Jail do not meet the standards imposed by the State concerning the treatment of State felons, the State cannot escape that responsibility by the simple expedient of systematically transferring its prisoners to local institutions for the indefinite future.

Therefore, having found that the State of Michigan has failed to provide substantially equivalent treatment for its female prison population, and that the use of the Kalamazoo County Jail for the housing of State female prisoners in these circumstances is proscribed by State statute and regulation, an order will be issued granting Plaintiffs declaratory and injunctive relief in accordance with the terms of this opinion.

## ORDER

In accordance with the Opinion entered on October 17, 1979,

IT IS ORDERED that the State provide a post-secondary education program comparable to that available to male inmates to as many of the qualified inmates at the Huron Valley Women's Facility [Huron Valley] as desire to participate;

that the course selection be made by officials of the Department of Corrections and representatives of the cooperating educational institutions in order to provide a systematic and coherent course package which, when successfully completed, culminates in the receipt of an Associate's Degree;

that the State make such efforts as are required to eliminate scheduling conflicts between courses, provide all required course materials in cooperation with the educational institution involved, and furnish transportation for qualified inmates attending courses taught at cooperating educational institutions, consistent with the reasonable requirements of security and cost; and otherwise to take such action as will promote the achievement of the goal of parity of educational programming offered male and female prisoners.

IT IS FURTHER ORDERED that the State, while not obligated to provide a four-year baccalaureate program at Huron Valley, may encourage the development of such a program in whatever manner available in light of its overall responsibility for educational programming at the facility; and, furthermore, neither the Opinion nor Order suggests that the State must halt any assistance currently being rendered or planned for the future on behalf of any women inmates who have made independent arrangements for participation in a baccalaureate program with Eastern Michigan University, or who may desire to make similar arrangements in the future with other institutions.

IT IS FURTHER ORDERED that a vocational counseling and testing program begin at Huron Valley forthwith, and that upon its completion a survey be taken of the inmates in order to determine their interests, needs, and abilities in preparation for the implementation of additional and revised vocational programming;

that the counseling program instruct and familiarize the inmates with the characteristics and employment potential of a range of jobs and skills prior to being tested for their interest in these areas;

that the State coordinate and administer this program in a manner of its choice consistent with the terms of this Order;

that the State implement those vocational programs receiving significant support from the inmates responding to the survey;

that the programs be taught, funded, and equipped in a manner comparable to vocational courses now offered to male prisoners, that the programs teach skills that are in demand in job markets, and that these programs prepare the participants for non-menial positions in the fields selected;

that, where required, modification and renovation of existing facilities begin as soon as the inmates' choices are determined;

and that current use of outside teaching institutions be continued and expanded in order to make efficient use of the resources and personnel available in the area, and that qualified inmates who desire to participate in these programs be transported to such institutions in accordance with appropriate security measures.

IT IS FURTHER ORDERED that, insofar as male prisoners are given the opportunity to train in a variety of apprenticeship programs which are related to existing prison industries at various State penal institutions, women prisoners be given the opportunity to participate in apprenticeship or pre-apprenticeship training wherever this training can be linked to the programs implemented on the basis of the survey results or to other employment opportunities at Huron Valley;

that the proposed prison industry program be reviewed to ensure that the education and rehabilitation goals of the Correctional Industries Act, M.C.L.A. §§ 800.321–800.335, will be met;

that, wherever possible, the positions created within the proposed prison industry be linked to apprenticeship or pre-apprenticeship training;

that all positions evaluated under the standardized wage scale currently in effect throughout the Department of Corrections be reviewed to ensure that departmental policy is applied fairly to inmates performing functions at Huron Valley comparable to those performed by male prisoners at similarly-sized institutions, and that discrepancies which occur are eliminated;

that a work pass program similar to that available to male inmates be made available to qualified inmates at Huron Valley;

and that qualified women at Huron Valley be given an opportunity to earn incentive good time through work performed for the Michigan Department of Natural Resources or some other designated employer, and that the State immediately begin efforts to locate and construct a correctional camp for women inmates similar to those available to male inmates for the purpose of earning incentive good time.

IT IS FURTHER ORDERED that to guarantee the inmates' right of access to the courts, the State continue to offer the assistance of Prison Legal Services, Incorporated, at Huron Valley, that a legal education program be installed in accordance with the terms of the Opinion, and that a further hearing on the matter of damages allegedly suffered by women inmates as a result of the alleged lack of an adequate law library at the Detroit House of Correction and Huron Valley be held on a date to be designated by the Court.

IT IS FURTHER ORDERED that the State's use of the Kalamazoo County Jail be halted unless and until the conditions of incarceration at the Jail are raised to the standards imposed by statute and regulation for the rehabilitation and care of State prisoners, or that the women inmates housed at the Kalamazoo County Jail are returned to State custody at Huron Valley.

IT IS FURTHER ORDERED that on or before January 1, 1980, the State submit to the Court a schedule for the prompt implementation of the terms of this Order relating to the vocational counseling and testing program, the work pass and incentive good time provisions, and the legal education course at Huron Valley;

that, on or before January 1, 1980, the State submit its plan for the enforcement of its obligations to its female inmates with respect to educational programming, apprenticeship training, prison industry, and standardization of wages as they apply to the inmates of Huron Valley in accordance with the terms of the Opinion and Order in this case;

that, on or before January 1, 1980, the State present a plan to the Court detailing the steps it will take to comply with the terms of the Opinion and Order which concern the incarceration of State female prisoners at the Kalamazoo County Jail;

that hearings on the State proposals be held at a time to be designated by the Court;

and that the State proposals become effective upon their approval by the Court.

This Court will retain jurisdiction until it is satisfied that the terms of the Opinion and Order in this case have been complied with in all respects.