Lawrence MOSS, Petitioner,

v.

Jeffrey CLARK, Respondent.

Civ. A. No. 88–0361–AM.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 21, 1988.

John D. Grad, Grad, Toothman, Logan & Chabot, P.C., Alexandria, Va., for petitioner.

Paula P. Newett, Asst. U.S. Atty., Alexandria, Va., for respondent.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I. *Introduction*

Prison overcrowding is a national problem. It is especially acute at Lorton Reformatory,[1] the prison facility for the District of Columbia.[2] As a result, many District of Columbia (D.C.) Code offenders, who would ordinarily serve their terms at Lorton, have instead been "federalized;" that is, they have been placed in the federal prison system by the Attorney General of the United States. While such transfers may help alleviate the problem of overcrowding at Lorton, they create another problem: disparate treatment of D.C. Code offenders in terms of earning good time credits depending on whether they are placed in Lorton Reformatory or a federal prison. Those placed in federal prison do not fare as well inasmuch as their eligibility for good time credits is governed not by District of Columbia law, but by less favorable federal law.

Petitioner Lawrence Moss, a D.C. Code offender incarcerated in the federal prison system, is one of those who complains of this disparate treatment. Specifically, he challenges the constitutionality of the District of Columbia Good Time Credits Act of 1986. D.C. Code § 24-428, *et seq.* (1987) (hereinafter "the Act"). By its terms, the Act applies only to District of Columbia violators housed in District of Columbia facilities. To that inmate category, the Act provides good time and educational credits that reduce the time to parole eligibility and mandatory parole release. Moss asserts that his placement in the federal system by the Attorney General denies him due process and equal protection of the laws because it renders him ineligible for the more generous good time credits available to the D.C. Code offenders incarcerated in District of Columbia facilities.

Based on a review of the petition filed *pro se* by Lawrence Moss and the response of the United States, the Court concluded that the issues raised in this suit were substantial and sufficiently complex to warrant appointment of counsel for petitioner. Accordingly, counsel was appointed and both parties were ordered to submit briefs on the constitutional issues raised by the petition. The District of Columbia was subsequently given leave to intervene by order of the Court.

---

1. See *Twelve John Does v. District of Columbia,* 841 F.2d 1133 (D.C.Cir.1988) (litigation involving violation of court-imposed population limits at Lorton); *Pitts v. Meese,* 684 F.Supp. 303, 306 n. 8 (D.D.C.1987) (emergency release decrees for non serious offenders).

2. Lorton Reformatory is owned by the United States. The land was acquired with the consent of Virginia and is held under a cession of exclusive jurisdiction to the United States. *See* Acts of Assembly 1901–1902. The facility was constructed with the intention that it be used to house prisoners of the District of Columbia, and the administrative authority was transferred to the District.

This matter is before the Court on petitioner Moss's Motion for Summary Judgment. The parties agree that the dispositive facts are undisputed and summary judgment, therefore, appropriate. Rule 56, Fed.R.Civ.P. Respondent further concedes that while Moss continues to be held at a federal institution, he will not receive good time credits as determined by the Act. Nonetheless, respondent maintains that petitioner has not made a valid equal protection argument because he is not "similarly situated" to offenders housed in District of Columbia facilities. Respondent argues that the Act's purpose is to alleviate severe overcrowding in District of Columbia prison facilities. Expanding the application of this Act to those prisoners transferred into the federal system would violate the purpose and intent of the Act because federal prisoners are not subjected to the same hardships stemming from overcrowding as are those inmates housed in District of Columbia facilities. Moreover, respondent argues that petitioner is entitled to good time credits under the provisions of 18 U.S.C. § 4161, which result in credits virtually identical to those previously available to petitioner under the scheme in effect when petitioner committed his offenses.[3] Finally, respondent argues that application of the Act to D.C. Code offenders housed in federal prisons would provide an unjustified windfall to those prisoners.

The precise question presented, therefore, is whether petitioner's due process and equal protection rights are violated by the failure to grant petitioner, as a D.C. Code offender, the Act's good time benefits simply because prison overcrowding requires that he be housed in the federal system. The Court holds that it does; petitioner should be subject to both the penalties and benefits, including good time credit, of the sovereign whose laws he violated. See Gilstrap v. Clemmer, 284 F.2d 804 (4th Cir.1960) (designation of place of confinement has no bearing on which parole laws apply; an offender is subject to the laws of the sovereign which convicted him, including good time credits which directly impact parole consideration). To deprive petitioner of these benefits and to subject him to a harsher good time regime solely to alleviate prison overcrowding arbitrarily creates two classes of similarly situated individuals and invidiously discriminates against one category on the irrelevant basis of incarceration situs.

## II. Jurisdiction

■ Jurisdiction over this petition is premised on 28 U.S.C. § 2241. Section 2241 challenges to Parole Commission decisions or to the execution of a sentence must be brought in the District Court with jurisdiction over the prisoner or the custodian. See Andrino v. United States Board of Parole, 550 F.2d 519 (9th Cir. 1977). Petitioner is currently housed at the Federal Correctional Institution, Petersburg, Virginia, a federal facility within the Eastern District of Virginia. Thus, this Court has jurisdiction over the prisoner. Further, the petition is properly brought under Section 2241 as it challenges the execution, rather than the legality, of the sentence. See, e.g., United States v. Snow, 748 F.2d 928 (4th Cir.1984) (Section 2241 is the proper vehicle for challenging the execution of sentence). Indeed, Section 2241 is especially appropriate for challenging the validity of a prisoner's detention where, as here, his federal custody does not result from a federal conviction. See, e.g., Plaster v. United States, 720 F.2d 340 (4th Cir.1983) (Section 2241 petition is the proper method to attack federal detention for purposes of international extradition).

## III. Facts

### A. The Petitioner

On October 2, 1985, Lawrence Moss was convicted and sentenced in the Superior Court of the District of Columbia. He received a 9 to 30 year indeterminate sentence for convictions of burglary, assault and theft.[4] Pursuant to the D.C. Code

---

3. See D.C. Code § 24–405 (repealed 1987).

4. This 9 to 30 year sentence results from consecutive terms of imprisonment of 2 to 6 years for assault with intent to kill and 7 to 24 years for burglary. No sentence appears to have been

§ 24–425,[5] the sentencing judge remanded petitioner to the custody of the Attorney General of the United States. Initially, petitioner was placed under the authority of the Department of Corrections for the District of Columbia.

Eight days after sentencing, Moss was transferred from the official custody of the District of Columbia Department of Corrections to the authority of the Federal Bureau of Prisons. This was occasioned by the severe overcrowding at the District of Columbia's correctional facility at Lorton, Virginia. Moss has been in the custody of the Bureau of Prisons continuously since October 10, 1985, when he was designated to serve his term at the Federal Correctional Institution (FCI) in Petersburg, Virginia.[6] During his incarceration in the federal system, Moss has received 31 days of extra good time credits for work performed in institutional operations pursuant to 18 U.S.C. § 4161.

### B. The Federal "Good Time" System

The Bureau of Prisons awards federal prisoners good time credits which reduce a prisoner's maximum sentence as an incentive to encourage good behavior and involvement in prison industry. All prisoners who demonstrate good behavior while incarcerated are automatically entitled to earn "good conduct" credits of five to ten days per month based on the length of their sentence. 18 U.S.C. § 4161.[7] This amount

is not awarded as a lump sum at the beginning of a sentence; it is credited monthly as earned.[8] In addition to the automatic "good conduct" credits, federal prisoners may earn, at the discretion of the Attorney General, "extra good time." 18 U.S.C. § 4162; 28 C.F.R. § 523.1–523.17 (1987). Extra good time is awarded for meritorious good time, work/study release good time, community treatment center good time, industrial good time, camp or farm good time and lump sum awards. *Id.* Prisoners may earn only one type of extra good time award at a time, except that a lump sum award may be earned in addition to any other extra good time award. Extra good time credits accrue at a rate of from three to five days per month for every month in which a prisoner participates in a specific activity or is incarcerated in a specific type of facility. 28 C.F.R. § 523.17(a).[9]

Meritorious good time credits are awarded to inmates performing work of "an exceptionally meritorious nature or ... of outstanding importance in connection with institutional operations." 28 C.F.R. § 523.11(a). Credits are also automatically available for inmates enrolled in work or study release programs for the entire period the inmate participates in the program. 28 C.F.R. § 523.12. The number of work/study release credits awarded lies completely within the discretionary authority of the Bureau of Prisons.

imposed for theft and the parties do not indicate the disposition of this charge.

5. D.C. Code § 24–425 provides in pertinent part: [t]he Attorney General may designate [as the place of incarceration] any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether within or without the District of Columbia. The Attorney General is also authorized to order the transfer of any such person from one institution to another if, in his judgment, it shall be for the well being of the prisoner or relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined, or for other reasons.

6. Respondent Jeffrey Clark is Warden at FCI Petersburg.

7. This section was repealed by Pub.L. 98–473 Title II, § 218(a)(4), Oct. 12, 1984, 98 stat. 2027 (effective Nov. 1, 1987). The statute remains applicable and effective for five years with respect to individuals convicted for offenses committed prior to November 1, 1987. It is, therefore, applicable to Petitioner.

8. Inmates committed to a federal or contract Community Treatment Center automatically receive credits for time spent in confinement at the Center. 28 C.F.R. § 523.13.

9. Section 523.17(a) provides that "[e]xtra good time is awarded at a rate of three days per month during the first twelve months of seniority in an earning status and at the rate of five days per month thereafter." "Seniority" refers to the time accrued in an extra good time earning status. 28 C.F.R. § 523.1.

Prisoners engaged in prison industries earn extra good time credits for each month they are employed. 28 C.F.R. § 523.14. Industrial good time is not awarded to inmates placed on a waiting list for a prison industry job. *Id.* Those inmates assigned to a farm or camp rather than a prison earn similar credits for each month they are assigned to a camp or farm facility. The final type of extra good time available to federal prisoners are lump sum awards. 28 C.F.R. § 523.16. Lump sum awards of up to thirty days credit may be recommended and made by the Warden of a prisoner's facility, and amounts in excess of thirty days may be approved and awarded by the Regional Director. Lump sum awards may be recommended for the following reasons:

(1) An act of heroism;

(2) Voluntary acceptance and satisfactory performance of an unusually hazardous assignment;

(3) An act which protects the lives of staff or inmates or the property of the United States ...;

(4) A suggestion which results in substantial improvement of a program or operation, or which results in significant savings: or

(5) Any other exceptional or outstanding service.

28 C.F.R. § 523.16(a).

The federal good time statute, 18 U.S.C. § 4161 *et seq.*, was repealed on November 1, 1987. These code sections remain in effect for five years from the date of repeal for individuals, like Moss, who committed offenses prior to that date. Pub.L. 98–473, Title II, §§ 218(a)(4), 235, Oct. 12, 1984, 98 Stat. 2027, 2031. The superceding Federal Good Times Act, found in the Sentencing Reform Act of 1984, effective November 1, 1987, may affect the computation of Moss's sentence after November 1, 1992. The Sentencing Reform Act eliminates most types of extra good time. Instead, Moss will be eligible for a maximum 54 days good conduct per year. Moreover, this good conduct credit does not vest until the completion of the sentence.

Most importantly, individuals sentenced in the federal system receive determinate sentences. Therefore, federal good time operates only to hasten a prisoner's mandatory release date. It does not reduce the minimum term required to be served before parole eligibility.

C. *The District of Columbia "Good Time" System*

The D.C. Good Times Credit Act, which went into effect on April 11, 1987, embodies the District's good time system. Its purpose is to "promote a uniform system of awarding good time credits ... to provide incentives for offenders to earn good time credits based on individual institutional adjustment, performance, and educational achievement; and to improve prison population control," (D.C.Law 6–218, 34 DCR 484, April 11, 1987). Prior to the passage of the Act, the District of Columbia scheme providing for good time credits was essentially identical to the federal statutory scheme. 18 U.S.C. §§ 4161 *et seq.*

Under the Act, an inmate imprisoned in a District of Columbia correctional facility is automatically entitled to a maximum of 10 days institutional good time per month.[10] These credits are applied to reduce the minimum term of imprisonment, to determine the date of parole eligibility and to reduce the maximum term of imprisonment to determine the date when parole release becomes mandatory. D.C. Code § 24–428 (1987 Supp.). District of Columbia prisoners are also automatically entitled to educational good time of not less than three days a month and not more than five days

---

**10.** D.C. Code § 24–428 provides that

[e]very person who is convicted of a violation of a District of Columbia ("District") criminal law by a court in the District of Columbia, imprisoned in a District correctional facility, and whose conduct is in conformity with all applicable institutional rules is entitled to institutional good time credits in accordance with the provisions of this section. Application of good time credits shall commence on the first day of the person's commitment to the custody of the Department of Corrections ("Department"), as follows:

. . . .

(5) Ten days for each month, if the sentence is 10 years or more.

a month upon the successful completion of an academic or vocational program. D.C. Code § 24–429 (1987 Supp.).[11] The credits are earned for each month the prisoner participates in a particular educational program. Institutional good time credits may be forfeited, withheld, and restored by the director of the Department of Corrections only after a hearing conducted in accordance with rules promulgated by the Mayor. D.C. Code § 24–432. The Act automatically vests an individual with good time credits as they are earned. A statutorily determined number of days are automatically subtracted (1) from the minimum term of imprisonment to determine parole eligibility and (2) from the maximum term to determine the mandatory release date. The educational credits available through the District of Columbia Act are applied in a similar manner.

### D. The District of Columbia and Federal Systems As Applied to Petitioner[12]

Unlike their federal counterparts, District of Columbia inmates serve indeterminate sentences. This allows District of Columbia good time to be credited against both the minimum and maximum terms of the sentence. The results are twofold: (1) reduction of the minimum sentence thereby accelerating parole eligibility, and (2) reduction of the maximum term thereby accelerating the mandatory release date. By contrast, federal good time credits reduce only the maximum term and accelerate only their mandatory release date. Parole eligibility dates remain unaffected by the application of federal good time credits. Thus, District of Columbia prisoners in federal custody must serve their entire minimum terms, unaffected by good time credit, before becoming eligible for parole. Their counterparts in District of Columbia facilities, as a result of the Act, realize an actual decrease in their minimum term and a corresponding acceleration of parole eligibility.

Under the Act, petitioner's original sentence of 9 to 30 years would be reduced to a minimum of approximately 6.2 years and a maximum of 19.7 years.[13] Petitioner would also be entitled to at least 671 days off his minimum sentence and 3600 days off his maximum sentence.[14] Further, he would receive additional reductions in the minimum and maximum terms for completion of educational programs. To date, Moss has completed a 24 month auto body program and apprenticeship, a three month basic education program and a five month Graduate Equivalency Diploma. For these educational endeavors, he would receive a total of 144 days of educational good time credits under the Act.

In the federal good time regime, Moss will not fair as well. First, he will receive either 2082 or 3600 days reduction from his maximum term of 30 years, depending on which good time statute applies after November 1992. These good time credits, however, would affect only his mandatory release date. His federal parole eligibility date is unaffected. Potential "extra good time" benefits cannot be quantified as the

11. Pursuant to D.C. Code § 24–429(a) (1987), Every person whose conduct complies with institutional rules and who demonstrates a desire for self-improvement by successfully completing an academic or vocational program, including special education and Graduate Equivalency Diploma programs, shall earn educational good time credits of no less than 3 days a month and no more than 5 days a month. These credits shall not be awarded until completion of the academic or vocational program.

12. This section reflects the material submitted by Moss to establish his claim of disparate treatment. See French v. Heyne, 547 F.2d 994, 999 (7th Cir.1976) (prisoners entitled to submit evidence in support of their claims).

13. Petitioner contends this results in a parole eligibility date of January, 1991 and a mandatory release date of July, 2005. (Declaration of Susan B. Smith). Respondent contends that parole eligibility is accelerated only to June 5, 1992 as a result of the application of the District's good time credit scheme with a mandatory release date of May 29, 2005. (Declaration of Jill H. Brooks). The discrepancy appears to flow from respondent's failure to account for educational credits.

14. The parties are unable to agree whether petitioner is entitled to either 671 or 864 days of institutional good time under D.C. Code § 24–428. The reduction in his sentence in either case would be substantial.

award of this good time is discretionary. In any case, any extra good time awarded would reduce only petitioner's maximum term. Despite his successful completion of an educational program, petitioner will not receive educational good time credit in the federal system for the auto body program; nor will he be eligible in the future for credits resulting from the completion of other educational programs.

The heart of petitioner's claim is that there is a significant difference between the good time benefits he receives because he was federalized and the Act's good time benefits he would have received had he remained in District of Columbia facilities. In an effort to quantify this difference, the Court directed counsel to confer with an eye toward reaching agreement on the precise number of days involved. This effort was not wholly successful. The following chart outlines the disputed credits [15] and their effect on petitioner's projected parole eligibility and mandatory release dates:

1. District of Columbia Good Time Credits Act

|  | Length of Sentence | Institutional Credit | Educational Credit | Projected Parole Eligibility Date | Projected Mandatory Release Date |
|---|---|---|---|---|---|
| Petitioner:* | 9 yrs | 864 days | 144 days | Jan. 1991** | |
| | 30 yrs | 3,600 days | 144 days | — | July 2005 |
| Respondent: | 9 yrs | 672 days | 144 days | June 5, 1992*** | |
| | 30 yrs | 3,600 days | 144 days | | May 29, 2005 |

11. Current Federal Statutory Scheme

|  | | | | | |
|---|---|---|---|---|---|
| Petitioner: | 30 yrs | 3,600 days | N/A | — | Nov. 2005 |
| Respondent: | 30 yrs | 3,600 days | N/A | April 7, 1994 | May 29, 2005 |

\* These are figures computed by petitioner's counsel. Petitioner also submitted his own independent calculations which are less favorable than these.

\*\* This date is arrived at by subtracting from 9 years the total number of days petitioner's counsel attributes good time credits. This total number of days is calculated as follows: 8 days per month × 12 months per year × 9 years = 864 days + 144 days for educational good time credit = 1008 days total.

\*\*\* This date is arrived at by subtracting from 30 years the total number of days respondent attributes to good time credits. This total number of days is calculated as follows: 8 days per month × 12 months per year × 7 years = 672 days + 144 days for educational good time credit = 816 days total.

Regardless of which set of figures is accepted, it is manifestly clear that petitioner gains the greater benefit by application of the Act. If awarded credits under the Act, petitioner faces a parole eligibility date of either January 1991 or June 1992. In contrast, if petitioner is limited to federal good time credits, his earliest parole date is April 1994. By the petitioner's analysis there is also a five month difference in the mandatory release date. Thus, the disparate effects resulting from application of the two schemes is plainly substantial.

## IV.

### Analysis

Petitioner's constitutional attack targets chiefly District of Columbia Code § 24–428, the provision that by its terms limits the Act's good time benefits to D.C. Code offenders housed in a "District correctional facility." According to petitioner, that provision, when coupled with the Attorney General's power to transfer District of Columbia offenders to federal prisons (§ 24–425), operated to create a constitutionally improper distinction between District of Columbia offenders who receive good time benefits under the Act and D.C. Code offenders who receive less generous federal good time benefits simply because they are placed in federal facilities. Petitioner contends this system of classification violates the Due Process and Equal Protection clauses. The Court's analysis of these contentions follows, prefaced by an inquiry into whether the statute may be construed to avoid the constitutional issue. The Su-

15. No projections for the amount of "extra good time" potentially available to petitioner is re-flected in these figures because of the discretionary nature of their award.

preme Court instructs that statutes are to be so construed, if "fairly possible, to avoid raising doubts of its constitutionality." *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1980); *see also Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *United States v. Clark,* 445 U.S. 23, 100 S.Ct. 895, 63 L.Ed. 2d 171 (1980).

## A. *Statutory Construction*

■ The instant issue arises because the Act extends its good time benefits only to District of Columbia offenders in a "District correctional facility." D.C. Code § 24–428. If the latter phrase could be construed to include those federal facilities housing District of Columbia inmates, the constitutional problem would disappear; in that event, two classes of D.C. Code offenders would not be created when the Attorney General transfers some Lorton inmates to federal facilities. All District of Columbia prisoners would instead receive the same good time benefits regardless of their incarceration situs. This is precisely the construction urged by Moss. The argument founders on the plain meaning of the statutory language; a federal prison is simply not a District of Columbia correctional facility within the plain meaning of that phrase. Except in rare circumstances, not present here, the judicial inquiry is complete where the terms of a statute are, as here, unambiguous. *See Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 702, 66 L.Ed.2d 633 (1980) [*quoting TVA v. Hill,* 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978)]. Worth noting, too, is that such a construction of § 24–428 would conflict with D.C. Code § 24–425. The latter provision grants to the Attorney General broad inmate transfer authority and apparently recognizes a distinction between institutions "maintained by the District of Columbia government" and those maintained by the federal government. *See also Pitts v. Meese,* 684 F.Supp. 303, 313 (D.D.C.1987) ("District of Columbia prison facility is not quite a federal facility"). In short, there is no warrant for construing the phrase "District correctional facilities" to include federal correctional facilities.

Nor is this conclusion undermined by the recent transfer of D.C.Code offenders to Washington State facilities where they are accorded "good time" credits under the Act. To be sure, these prisoners are not in a "District correctional facility." They are awarded the Acts' good time benefits, however, because they remain under the control of the District of Columbia. They are transferred to Washington State under contract, their transfer is temporary, the District of Columbia pays for the prisoners' care and upkeep, and the District of Columbia Department of Corrections determines, *inter alia,* the transferred prisoners' parole eligibility and any reduction of their sentences. On the other hand, prisoners who are "federalized" are permanently transferred and cease to be within the control of the District of Columbia Department of Corrections. These differences are deemed sufficient by the District of Columbia to warrant application of the Act to inmates temporarily sent to the State of Washington. Whatever the merits of this interpretation of the Act, however, it is not binding on this Court; the plain statutory language is. Federal prisons are simply not "District correctional facilities."

## B. *Equal Protection*

Unmistakable from the instant record is that the Act creates two classes of D.C. Code offenders: first, those who receive the Act's good time benefits because they have been left in District of Columbia correctional facilities,[16] and second, those who receive the less generous federal good time benefits because they have been federalized. The question is whether this results in an equal protection violation.

---

16. This class would also include all D.C. Code offenders who have been transferred to other state facilities, but who remain under the control of the D.C. Department of Corrections. Those offenders who have been transferred to the State of Washington, for example, would be included in this class because the D.C. Department of Corrections retains control over, *inter alia,* their parole eligibility.

At bottom, the Equal Protection Clause guarantees that local, state and the federal governments treat similarly situated persons similarly; it restrains arbitrary governmental classifications which lead to invidious discrimination. *See City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). The constitutional prohibition extends both to statutes which, on their faces, draw discriminatory classifications, *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880), and to statutes which, when applied, lead to discriminatory classifications. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979).

■ Not all government-made classifications are proscribed; nor are all government-made classifications reviewed under the same standard. Statutes which purposefully impair a fundamental right [17] or deal with a "suspect classification," especially classifications relating to race or national origin, are subject to "strict scrutiny." *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Under this standard of review, the government-made classification is upheld only if it is found to be necessary to obtain a compelling government objective. Few government-made classifications pass this rigorous test. *See, e.g., Police Department of City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

In the absence of either purposeful impairment of a fundamental right or suspect classification, a less rigorous standard of review is applied.[18] This standard of review is often referred to as the "mere rationality" standard. *See Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). When this standard is applied, the judicial inquiry is limited to ascertaining whether the classification in issue bears a rational relation to a permissible governmental objective. *See City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Metropolitan Life Insurance Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920); *see also Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911) (law will be stricken only if "purely arbitrary"). The applicability to the instant case of each of these standards of review is separately considered.

(1) Strict Scrutiny

No suspect group is involved here, nor has any fundamental right been intentionally impaired. Application of the strict scrutiny standard of review is therefore inappropriate. Prisoners are not members of a suspect class. Although the case law is sparse, most judicial decisions confirm this conclusion. *See Thornton v. Hunt,* 852 F.2d 526 (11th Cir.1988) (per curiam) (prisoner challenge to denial of good time benefits did not give rise to claim of violation of suspect classification or fundamental right); *see also McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059–60, 35 L.Ed.2d 282 (1973) (decision assumes that prisoner claim is not one reviewed under the suspect classification standard); *French v. Heyne,* 547 F.2d 994, 998 (7th Cir.1976) (same); *Durso v. Rowe,* 579 F.2d 1365, 1372 (7th Cir.1978) (same). *But see Sawyer v. Sigler,* 320 F.Supp. 690, 698 (D.Neb.1970), *aff'd,* 445 F.2d 818 (8th Cir. 1971) (denial of good time benefits to pris-

---

**17.** *See Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

**18.** An intermediate standard of review, "heightened scrutiny," is applied to governmental classifications based on gender and illegitimacy. *See Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982) (gender); *Matthews v. Lucas,* 427 U.S. 495, 505, 96 S.Ct. 2755, 2762, 49 L.Ed.2d 651 (1976) (illegitimacy). The parties during oral arguments agreed with the Court that, because neither gender or legitimacy classifications are implicated, heightened scrutiny is not applicable to Moss's claim.

oners physically unable to work but granting it to those who participated in prison industry violated Equal Protection clause).[19] And there is good reason for this relative uniformity in decisional authority. The justifications for prisoner classifications are not typically pernicious; those for classifications based on race, alienage, national origin, gender, and illegitimacy generally are.

Classifications based on race, alienage, or national origin, as the Supreme Court said in *City of Cleburne*, "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." 473 U.S. at 440, 105 S.Ct. at 3254. Similarly, classifications based on gender or legitimacy are subject to heightened scrutiny review because those factors generally provide no justifiable ground for differential treatment. Put another way, such classifications commonly bear no relation to an individual's ability to participate in society. *Id.* at 440–41, 105 S.Ct. at 3254–55. Statutory classifications of incarcerated prisoners are different. Typically they are not based on prejudice; to the contrary, such regulations are essential for the proper management of prisons. For example, correctional authorities must differentiate between prisoners to ensure that prisoners who committed more serious offenses are incarcerated in stricter security facilities and to monitor prisoners' parole eligibility. *Cf. Thornton v. Hunt*, 852 F.2d 526 (11th Cir.1988) (per curiam). It is, therefore, clear that incar-

ceration in and of itself does not give rise to the existence of a suspect classification.[20]

It is equally clear that Moss cannot claim the impairment of a fundamental right. Fundamental constitutional rights in this context are to be narrowly drawn by the courts. *San Antonio Independent School District v. Rodriquez*, 411 U.S. 1, 34, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973). As one court noted in analyzing a fundamental rights claim, the Supreme Court "has not expanded the list of fundamental rights beyond privacy, marriage, travel, voting, political association, criminal appeals and religion." *Coburn v. Agustin*, 627 F.Supp. 983, 993 (D.Kan.1985). For example, in *San Antonio Independent School District*, the Supreme Court held that there was no constitutional right to education or rehabilitation. 411 U.S. at 35, 93 S.Ct. at 1298. The only fundamental constitutional right conceivably at issue here would be a right derived from a protected liberty interest. The court in *Bolling v. Manson*, 345 F.Supp. 48, 51 (D.C.Conn.1972), held that consigning a prisoner to a lengthier sentence impinges directly on a fundamental liberty interest. In so doing, according to *Bolling*, the lengthier sentence violated a fundamental constitutional right. For this reason, the *Bolling* court applied a "strict scrutiny" standard of review to the prisoner's equal protection claim. This Court declines to follow *Bolling* for two reasons. First, neither the Supreme Court nor any Court of Appeals has suggested that challenges to good time benefits impinge on a

19. The District Court in *Sawyer* applied a heightened level of scrutiny to the prisoners' claims. *See Sawyer*, 320 F.Supp. at 699. The court, however, did not explain why a heightened level of scrutiny was applied. The state of Kansas did not appeal the adverse equal protection decision.

20. *Griess v. Colorado*, 624 F.Supp. 450, 455–56 (D.Co.1985), *aff'd*, 841 F.2d 1042 (10th Cir.1988), does not contradict this analysis. While *Griess* subjected a "good time" credit classification to strict scrutiny, the classification in *Griess* was based solely on prisoners' ability to post bond. *Griess* applied a test developed by the Supreme Court in *San Antonio Independent School Dis-*

*trict v. Rodriquez*, 411 U.S. 1, 20–21, 93 S.Ct. 1278, 1289–90, 36 L.Ed.2d 16 (1973), for reviewing wealth classifications. This test, when applied to the bond requirement, led the *Griess* court to find that the wealth classification was suspect. *Griess* thus does not hold that being incarcerated in and of itself gives rise to strict scrutiny. Cases reviewing prison classifications based on gender are equally inapposite. *See, e.g., Pitts v. Meese*, 684 F.Supp. 303 (D.D.C.1987); *Glover v. Johnson*, 478 F.Supp. 1075 (E.D.Mich. 1979). Gender classifications are subject to "heightened scrutiny," and this is true whether the gender classification is related to imprisonment or to some other circumstance.

fundamental right.[21] Second, if all prisoner challenges involving length of sentence implicated a fundamental right, many uncontroversial aspects of prison administration might then become subject to strict scrutiny review. Courts, in this event, would serve as a review panel for many aspects of prison administration. This judicial role is wholly inappropriate.[22] In any event, since the Act neither involves a suspect classification nor impacts on a fundamental right, strict scrutiny is inappropriate.

### (2) Rationality Review

While the Act escapes strict scrutiny, it is still subject to rationality review. *See Durso v. Rowe*, 579 F.2d 1365, 1372 (7th Cir.1978) ("The lack of a fundamental constitutional right or the absence of a suspect class merely affects the court's standard of review; it does not destroy the cause of action."); *French v. Heyne*, 547 F.2d 994,

997 (7th Cir.1976) (applying rational basis test to prisoner claim). Under this standard of review, the Act will be valid if it "rationally furthers some legitimate, articulated state purpose." *McGinnis v. Royster*, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973). Before measuring the Act against this standard, some historical perspective is useful.

Until recently, courts almost invariably rejected equal protection claims based on the rationality standard.[23] More recently, however, chiefly in the 1980's, the Supreme Court has demonstrated that the rationality standard has teeth; the Court has struck down a number of statutes and regulations for lack of a rational basis under the Equal Protection Clause.[24] Lower courts, too, have increasingly recognized that rationality review no longer requires automatic approval of governmental enactments.[25] It is clear, then, that the Act's

21. *See McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973) (("[T]he court below rightly concluded [the parole statutes] require only some rational basis to sustain them."); *Thornton v. Hunt,* 852 F.2d 526 (11th Cir.1988) (per curiam) (good time act benefits do not impinge on a fundamental right); *French v. Heyne,* 547 F.2d 994, 997 n. 2 (7th Cir.1976) (in prisoner challenge to education program, "[n]either party suggests that fundamental constitutional rights are at stake here ..."); *Durso v. Rowe,* 579 F.2d 1365 (7th Cir.1978) (assumes no fundamental right implicated by prisoner's equal protection challenge to revocation of work release status).

22. *See McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973) ("We do not wish to inhibit state experimental classifications in a practical and troublesome area, but inquire only whether the challenged distinction rationally furthers some legitimate, articulated state purpose."); *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) ("Federal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' including prisoners."); *see also Sawyer v. Sigler,* 445 F.2d 818, 819 (8th Cir.1971) ("[I]t is not the function of the courts to run the prisons, or to undertake to supervise the day-to-day treatment and discipline of individual inmates. Much must be left to the discretion and good faith of administrators.").

23. *See, e.g., Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949); *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955);

*Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959). *But see United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (invalidating amendment to Food Stamp Act as not rationally related to stated purpose of eliminating fraud).

24. *See, e.g., Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); *City of Cleburne, Texas v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Metropolitan Life Insurance Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985).

25. *See generally Coburn v. Agustin,* 627 F.Supp. 983, 988–91 (D.Kan.1985) (thorough analysis of differences between earlier "rational relationship" decisions and recent Supreme Court decisions—concludes that recent decisions announce a departure from traditional rationality review to a more stringently applied review of governmental enactments). Rationality review is now regularly used to strike down irrational regulations or regulations not rationally related to a legitimate state purpose. *See, e.g., Diebler v. City of Rehoboth Beach,* 790 F.2d 328 (3rd Cir.1986) (striking down requirements for political candidates); *Sullivan v. City of Pittsburg, Pennsylvania,* 811 F.2d 171 (3rd Cir.1987) (plaintiff likely to succeed on merits in challenge to city zoning requirements—preliminary injunction issued);

disparate treatment of D.C. Code offenders based on incarceration situs will be struck down unless it bears a rational relationship to a legitimate governmental purpose.

■ Respondent argues that the Act serves the legitimate purpose of reducing prison overcrowding in District of Columbia prisons.[26] Relieving prison overcrowding in District of Columbia correctional facilities is undeniably a legitimate governmental purpose. *See United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (any plausible statutory purpose is legitimate). It is also clear that by releasing prisoners earlier the "good time" benefits directly relate to this legitimate purpose. But these contentions are beside the point; they do not address Moss's challenge. Moss does not challenge the rationality of the Act in awarding "good time" benefits to D.C.Code offenders to relieve prison overcrowding; rather, Moss challenges the rationality of denying him good time benefits to relieve prison overcrowding. Put another way, Moss challenges the necessity of disparately treating two classes of D.C. Code offenders to obtain a permissible objective. The fact is, there is no such necessity; the goal of relieving overcrowding can be achieved without creating two classes of D.C. Code offenders and treating them differently in terms of good time credits. Indeed, if

Moss were awarded District of Columbia good time benefits, there would be no effect at all on overcrowding at District of Columbia facilities. Instead, the result would be to relieve, if only slightly, any prison overcrowding in the Petersburg facility.[27] In short, denying Moss "good time" benefits because he is in a federal correctional facility is not at all rationally related to the relief of prison overcrowding in District of Columbia correctional facilities.

Respondent also argues that application of the Act to Moss would provide an unjustified windfall to Moss because he is not subject to the same overcrowding hardships as prisoners in District of Columbia facilities. This argument misses the point. The Act leads to disparate and discriminatory treatment of Moss. Whether Moss is provided with a windfall or not is unrelated to the legitimate state purpose needed to justify excluding District of Columbia "good time" benefits from Moss. Respondent does not argue that computing Moss's D.C. "good time" benefits increases administrative expenses. Such an argument would be wholly inadequate in the face of Moss's showing that his constitutional rights are being violated. A slight increase in the administrative burden for either the respondent or the intervenor is not sufficient grounds for denying Moss his constitutional protections.[28] *See Stanley v. Illi-*

*Stieberger v. Heckler*, 615 F.Supp. 1315 (S.D.N.Y. 1985) (plaintiff likely to succeed on merits in challenge to Secretary of Health and Human Services non-acquiescence policy—preliminary injunction issued); *Coburn v. Agustin*, 627 F.Supp. 983 (D.Kan.1985) (striking down portions of medical malpractice enactments); *Long Island Lighting Co. v. Cuomo*, 666 F.Supp. 370 (N.D.N.Y.1987) (striking down New York's Used and Useful Act for nuclear power plants); *Burstyn v. City of Miami Beach*, 663 F.Supp. 528 (S.D.Fla.1987) (striking down zoning ordinance).

**26.** Respondent argues that Moss is not similarly situated to other prisoners because he is not housed in a D.C. facility and, therefore, is not a proper party to raise the equal protection claim. This argument is without merit; if accepted, it would make the very disparate treatment complained of by Moss grounds for dismissing his complaint. Moss was tried, convicted and sentenced pursuant to the laws of the District of

Columbia. He is, therefore, similarly situated to other District Code offenders.

**27.** Transferring Moss to a federal correctional facility does serve to relieve prison overcrowding in D.C. correctional facilities. The Attorney General, however, does not condition federalizing D.C. Code offenders on their receiving federal good time benefits. Such transfers and assignments are, therefore, unrelated to Moss's claim here. No evidence presented to the Court suggests a contrary conclusion.

**28.** Respondent points out that by granting Moss D.C. good time benefits a disparity will be created between Moss and federal prisoners. These prisoners, however, are not similarly situated with Moss because they are not D.C. Code offenders. Only D.C. Code offenders are tried, convicted and sentenced under D.C. laws; therefore, only D.C. Code offenders should receive D.C. good time benefits.

*nois,* 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972) ("The Constitution recognizes higher values than speed and efficiency.").

■ Denying Moss the District of Columbia good time benefits is not rationally related to a legitimate state purpose; that portion of D.C. Code § 24–428 which states that good time benefits apply only to prisoners in a "District correctional facility" must be stricken as unconstitutional. But this does not invalidate the remainder of the Act: "[i]nvalidation of a portion of a statute does not necessarily render the whole invalid unless it is evident that the legislature would not have enacted the legislation without the invalid portion." *Zobel v. Williams,* 457 U.S. 55, 65, 102 S.Ct. 2309, 2315, 72 L.Ed.2d 672 (1982). While the Act does not include a severability clause, more is required for the Court to invalidate the entire Act solely on the basis of a single offending phrase. In essence, there must be persuasive evidence that the District of Columbia Council would not have passed the Act without the invalid phrase. No such evidence exists. This is not surprising. The Act fulfills its purpose of relieving prison overcrowding wherever the beneficiaries of its good time benefits may be incarcerated. Thus, the Act, minus the offending phrase, should remain in effect because it is "fully operative as a law." *Champlin Refining Co. v. Corporation Commission of Oklahoma,* 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932).

### C. *Due Process*

Moss also contends that denying him District of Columbia good time credits violates his rights under the Due Process Clause of the Fifth Amendment.

■ For Moss's due process claim to be valid, he must have a protected liberty interest in District of Columbia good time benefits. Whether a liberty interest is created by the Act must be determined on a case by case basis. *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979). Crucial to this inquiry is an analysis of the language and structure of the Act to establish whether it substantially limits official discretion in administering good time benefits. An interest protected by the due process clause is not created by a law or regulation that does not place significant limits on official discretion. *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). Put another way, Moss must establish that the Act establishes particularized standards for the awarding of good time benefits by the District of Columbia Department of Corrections. *Brandon v. District of Columbia Board of Parole,* 631 F.Supp. 435, 438–39 (D.D.C.1986), *aff'd,* 823 F.2d 644 (D.C.Cir.1987). If so, a liberty interest is created.

*Greenholtz* is illustrative. There the Supreme Court held that Nebraska had created a liberty interest in parole. The nondiscretionary terms of the Nebraska statute were central to the Court's decision. The statute stated that the parole board *"shall"* grant parole unless the board found it should be denied for one of four enumerated reasons. As the Court in *Brandon* pointed out, mandatory language, or its equivalent, is required to find a liberty interest. *Brandon,* 631 F.Supp. at 439.[29] Similarly, the Supreme Court has recognized that under certain circumstances a liberty interest may be created by states in good time benefits. *Wolff v. McDonnell,* 418 U.S. 539, 556–58, 94 S.Ct. 2963, 2974–76, 41 L.Ed.2d 935 (1974). Denial of good time benefits, if a liberty interest in such benefits is established, gives rise to due process protections. *See also Durkin v. Davis,* 390 F.Supp. 249 (E.D.Va. 1975) (deprivation of Virginia good time credits gives rise to due process protections).

---

**29.** The *Brandon* court found that a liberty interest had not been created in D.C. parole benefits. The Act was adopted in 1987, however, so the *Brandon* court did not study whether a liberty interest had been created in D.C. good time benefits. In fact, its analysis supports this Court's conclusion that a liberty interest has been created in these benefits.

The Act provides that District of Columbia offenders are entitled to good time credits which "shall commence" on the first day of the prisoner's commitment. D.C. Code § 24-428 (1987). In addition, prisoners whose conduct complies with institutional rules and who complete academic or vocational programs, "shall earn educational good time credits" according to a set schedule. D.C. Code § 24-429 (1987). Moreover, award of institutional good time credits shall be applied without regard to the person's award of educational good time credit, providing that an unlimited number of educational good time credits may be accumulated along with institutional good time credits. *Id.* Forfeiture of these credits is contemplated only in accordance with rules promulgated by the Mayor and implemented by the Director of the Department of Corrections. D.C. Code § 24-432 (1987).

The mandatory language of the Act compels the conclusion that a statutorily created liberty interest is created.[30] The explicit grant of rights, positively stated, and not subject to forfeiture absent certain limited conditions entitles prisoners to due process protection for the denial of these rights. *See Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106; *Franklin v. Shields,* 569 F.2d 784, 790 (4th Cir.1977); *Raso v. Moran,* 551 F.Supp. 294, 297 (D.R.I.1982). Where, as here, the statute mandates granting of credit on a virtually automatic basis, a justifiable expectation of credit is created which is protected by the due process clause. *See Paoli v. Lally,* 812 F.2d 1489 (4th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 184, 98 L.Ed.2d 137 (1987). The Act's mandatory language coupled with the objective criteria required to grant educational credits and the precise schedule for earning credits operate together to create an entitlement to credits and to the concomitant effect credits have on minimum and maximum terms. It follows, therefore, that Moss has a protected liberty interest in the Act's good time benefits.

The Court must next determine whether this liberty interest has been violated. The standard for determining whether a due process right has been violated by the operation of a statute is similar to the "rational relation" test applied in the equal protection context: a rational relation must be shown between the effect or application and the purposes of the statute. *National R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). The key to this inquiry is whether there exists a justifiable basis on which good time credits can be denied or whether the government has acted in an arbitrary and irrational way. *Id.* at 472, 105 S.Ct. at 1455. For the reasons stated in the analysis of Moss' Equal Protection claim, the Court finds that there is no rational relation between the Act's legitimate purposes and the arbitrary denial to Moss of the Act's good time benefits.

The final step in the analysis is to determine what process Moss is due before his liberty interest can be infringed.[31] In this case, however, the Court need not reach this step. The Equal Protection remedy eliminates the necessity to consider what process Moss should have been accorded.

## V. Conclusion

This Memorandum Opinion began with a recognition of the severe prison over-

---

**30.** *See Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975-76, 41 L.Ed.2d 935 (1973) (the Constitution does not itself guarantee good time credits, but state statute entitling inmates to good time which is limited only by commission of serious institutional misconduct creates a constitutionally protected liberty interest).

**31.** What process may be constitutionally required is a function of the nature and purpose of the right or interest implicated. *See Wolff v. McDonnell,* 418 U.S. at 557. In this instance, determination of the appropriate process would require the Court to focus on the nature and purpose of good time credits. Although the Court does not reach this issue, it notes, *obiter,* that appropriate process would probably require notice to D.C. Code offenders of denial of the Act's benefits and an opportunity for these prisoners to challenge this denial of benefits. *See, e.g., Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Wolff v. McDonnell,* 418 U.S. at 556-572, 94 S.Ct. at 2974-82; *Miller v. Twomey,* 479 F.2d 701, 713-719 (7th Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974); *Raso v. Moran,* 551 F.Supp. 294 (D.R.I.1982).

crowding problem that currently exists in the District of Columbia correctional facilities. The Court is aware that responsible officials are currently endeavoring to resolve or ameliorate the problem. Certainly, the Court has no wish to exacerbate the problems prison officials face or to add unnecessarily to their burdens. In this connection, the Court is mindful that the practical effect of its ruling in this case is to impose only an incremental administrative burden on prison officials to maintain Moss's good time record in accordance with the Act rather than the federal good time provisions. No evidence was presented on the nature and extent of this incremental burden. Nor is any such evidence necessary for it has no place in the equal protection constitutional calculus. An administrative burden alone cannot, in this context, excuse a constitutional violation. *See Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *cf. Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). In any event, there is no reason to believe such a burden is insurmountable or excessive, even assuming other inmates share Moss' predicament.[32]

Distilled to its essence, this decision concludes as follows:

(1) The Act's good time credits are more favorable to Moss than those awarded under the federal scheme.

(2) By its terms, the Act denies its benefits to Moss, a D.C. Code offender, because he is housed in a federal facility.

(3) The Act, in effect, creates two classes of D.C. Code offenders: those housed in District of Columbia facilities who receive the Act's good time credits and those who receive the less favorable federal good time credits because they are housed in federal facilities.

(4) This classification of D.C. Code offenders, as it applies to Moss, violates the Equal Protection Clause because

there is no rational relation between the legitimate goal of relieving prison overcrowding and the denial to Moss of the Act's good time credits; the goal can be achieved without discriminating against Moss on the basis of incarceration situs; the alleviation of prison overcrowding through the award of good time credits does not require denying to Moss the Act's good time credits.

(5) The denial to Moss of the Act's good time benefits is arbitrary, affects a liberty interest, and therefore constitutes a denial of due process.

Accordingly, petitioner Moss' writ of *habeas corpus* is granted and respondent Clark is directed to accord to Moss good time credits he is entitled to under the Act.

An appropriate order has previously been issued.

---

**32.** There are doubtless many who, with Moss, fall into the category of D.C. Code offenders denied the Act's benefits because they are housed in federal facilities. One of those appears to be John Michael Brand, Jr. who is currently incarcerated at FCI Petersburg. Brand's action under 28 U.S.C. § 2241 was earlier consolidated with this action. *Brand v.* *Clark*, CA No. 88–0968–AM (E.D.Va.1988) (order of consolidation). Brand's petition is not disposed of herein because the record does not adequately disclose the facts and circumstances pertaining to his claim. Should the record in that case ultimately disclose that the Brand case is indistinct from the instant case, then the same result will obtain.